**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| SONY ELECTRONICS, INC., et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>SOUNDVIEW TECHNOLOGIES, INC.,<br><br>*Defendant*. | Lead Docket No.:<br>3:00 CV00754 (JBA)<br>USDC/New Haven<br><br>Member Case Nos.:<br>3:00 CV 768 (JBA)<br>3:00 CV 981 (JBA)<br><br>ALL CASES |

**MEMORANDUM IN SUPPORT OF THE NON-SOUNDVIEW**
**PARTIES' MOTION FOR ATTORNEY FEES**

December 8, 2004

Of Counsel:

Richard L. DeLucia
Richard S. Gresalfi
Elizabeth Gardner
KENYON & KENYON
One Broadway
New York, NY
Tel: 212-425-7200
Fax: 212-425-5288

Vincent J. Belusko
Robert S. McArthur
MORRISON & FOESTER LLP
555 W. Fifth Street
Los Angeles, CA 90013
Tel: 213-892-5200
Fax: 213-892-5454

Larry S. Nixon
Jeffry H. Nelson
Robert Adams
NIXON & VANDERHYE P.C.
1100 N. Glebe Road
Arlington, VA 22201
Tel: 703-816-4000
Fax: 703-816-4100

Peter J. Kadzik
DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP
2101 L Street NW
Washington, DC 20037-1526
Tel: 202-785-9700; Fax: 202-887-0689

William M. Bloss
KOSKOFF, KOSKOFF & BIEDER, P.C.
350 Fairfield Avenue
Bridgeport, Connecticut 06604
Tel: 203-336-4421
Fax: 203-368-3244

Jacqueline D. Bucar (CT01187)
TYLER, COOPER & ALCORN
205 Church Street
New Haven, CT 06509
Tel: 203-784-8200
Fax: 203-789-2133

Brian E. Moran
ROBINSON & COLE LLP
Financial Centre
695 East Main Street
Stamford, CT 06904-2305
Tel: 203-462-7500
Fax:  203-462-7599

Attorneys for Plaintiff/Counterclaim
Defendants Sony Electronics Inc. and Sony
Corporation of America on behalf of all of
the Non-Soundview Parties.

## INTRODUCTION

This Court summarily found that the Non-Soundview Parties (five television manufacturers and two industry associations)[1] did not infringe Soundview's patent and that they did not violate the federal antitrust and Connecticut unfair trade practices laws. *See Sony Elec. Inc. v. Soundview Techs., Inc.*, 225 F. Supp. 2d 164 (D. Conn. 2002); *Sony Elec. Inc. v. Soundview Techs., Inc.*, 281 F. Supp. 2d 399 (D. Conn. 2003). The United States Court of Appeals for the Federal Circuit affirmed the Court's judgements just three days after oral argument and without opinion. *See Sony Elec. Inc. v. Soundview Techs., Inc.*, No. 04-1057, 2004 U.S. App. LEXIS 18406 (Fed. Cir. Aug. 11, 2004). Although Soundview managed to squeeze some $25 million from the television industry, the Non-Soundview Parties successfully defended themselves against Soundview's claims, which were based on a construction of the patent in suit that the Court recognized was "flawed," "lack[ing] any support in the claims" and "clearly belied by the remainder of the specification." Having spent millions of dollars to ward off these baseless claims, the Non-Soundview Parties now seek to recover their attorney fees. Accordingly, pursuant to the Court's November 10, 2004 Scheduling Order (D.I. 470),[2] the Non-Soundview Parties respectfully submit this memorandum to accomplish that result.

Every claim of Soundview's patent (Reexamined United States Patent 4,554,584 ("the '584 patent")), which is directed to a circuit for selectively blanking the output of a

---

[1] The Non-Soundview Parties are Sony Corporation of America, Sony Electronics Inc., Mitsubishi Digital Electronics America, Inc., Sharp Electronics Corp., Toshiba America Consumer Electronics Products, Inc., the Consumer Electronics Association and the Electronic Industries Alliance.

[2] "D.I. __" refers to the Court's Docket Index number for this case.

television receiver, plainly requires "a separate rating signal line" for each criteria related to program content that the circuit can interpret.  Soundview *never* had a good faith belief that the Non-Soundview Parties' microprocessor-based televisions had such a structure. Both Mr. Schmidt, a principal in Soundview, and Mr. Elam, an inventor named on the patent, recognized *prior* to filing this lawsuit that a microprocessor-controlled blocking system did not have "separate rating signal line[s]" as the patent required.  Thus, early on, knowing there was no infringement (for the very reasons on which this Court based its summary judgment), Soundview vigorously demanded licensing fees from the industry and, ultimately, filed and pursued this lawsuit.

In demanding undeserved royalties from the television industry, Soundview has consistently and blindly ignored the '584 patent's "separate rating signal line" limitation, opting instead to advance untenable interpretations of the claims to extract money from the manufacturers under the onus of litigation.  In this regard, Soundview ignored the inventor Elam's admonition that the "separate rating signal line" requirement sharply limited the patent's scope.  It ignored letters from the Non-Soundview parties advising it that their televisions had no "separate rating signal line[s]."  And, it was unfazed by the Special Master's rejection of its untenable constructions of the "separate rating signal line" limitation.  Indeed, after the Special Master rejected one untenable construction of the "separate rating signal line" limitation, Soundview plowed forward and presented this Court with yet another equally untenable construction.

Even after this Court rejected its infringement claims, Soundview wrongly insisted that its antitrust and unfair trade practices claims were still viable, further forcing this Court and the Non-Soundview Parties to squander time, effort and money to address

those claims. Best described as *an assertion that parties who were not infringing and thus did not need a license "conspired" not to take a license*—the Court summarily rejected these claims as well. Even Soundview was too embarrassed to argue this theory on appeal.

Soundview's behavior cries out as truly "exceptional" under 35 U.S.C. § 285 because it filed and proceeded with this litigation in bad faith and with reckless disregard. The Non-Soundview Parties were forced to spend millions of dollars proving what Mr. Elam and Soundview knew all along: the accused microprocessor-based parental control systems did not have the fifty-four "separate rating signal line[s]" necessary for infringement. Moreover, Soundview's decision to continue this litigation after claim construction and, further still, after summary judgment of non-infringement, manifests a clear violation of 28 U.S.C. § 1927 as well. For these reasons, the Non-Soundview Parties request that the Court order Soundview and/or its attorneys to reimburse them for the attorney fees and costs spent to defend against this baseless lawsuit.

## STATEMENT OF FACTS

**A.    Schmidt and Elam Suspected in 1994 that the '584 Patent Did Not Cover a Microprocessor-based Parental Control Implementation, Even as They Began Their Shakedown Campaign**

In 1994, a full six years before the filing of this lawsuit, both the primary inventor, Carl Elam, and one of the principals in Soundview, David Schmidt, knew that a microprocessor-based implementation for parental control would not meet the "separate rating signal line[s]" limitation of the '584 patent claims.

In the early 1990s, while investigating the general field of program blocking device patents for a "good business opportunity," Schmidt conducted a Patent Office search and uncovered several patents relating to a category of devices that would later be coined "v-chip" technology.  (*See* DI. 404, ¶ 4 [Local Rule 9(c) Statement of Fact in Support of the Non-Soundview Parties' Opposition to Soundview's Motion for Summary Judgment of No Inequitable Conduct (hereinafter "Facts")].)  Schmidt (as Eclipse Products) contacted the inventors named on some of the patents  to inquire whether they would be interested in selling their patents**.**  *Id.*, ¶ 5.  As part of this effort, Schmidt contacted Elam about the '584 patent.  *Id.*, ¶ 6.

Because of the '584 patent's express "separate rating signal line[s]" limitation Schmidt had serious (and accurate) concerns regarding the applicability of its claims to microprocessor-based parental control systems.  Schmidt relayed his concerns—and the concerns of his attorneys—to Elam, who passed them along to his own attorneys in an August 29, 1994 memorandum, in which he wrote:

> <u>My question is</u>:  in your opinion, would it be an infringement upon this patent if an implementation using a <u>microprocessor</u> were used, which achieved the same result with software *and avoided* specifically using the "rating signal lines".
>
> The <u>reason for asking</u> this question is that a company named <u>Eclipse Products Inc.</u> of Darien, CT is attempting to promote this concept to the Cable TV industry … In the process, the issue came up which I posed in my question above.  The patent attorneys who performed the review indicated that use of "rating signal lines" in Claim 1 may tend to limit the scope of my patent allowing alternate microprocessor implementations….

(Exh. 1 at ELAM 01289 [Elam Depo. Exh. 10](underlining in original, italics added.))

Thus, as early as 1994, Elam the inventor, Schmidt the speculator and the speculator's attorneys recognized that televisions that used microprocessors for parental control would not have the "separate rating signal line[s]" that the '584 patent requires. Later, during his deposition in this case, Elam admitted that, as he suspected in 1994, the "separate rating signal line" limitation of the claims of the '584 patent would require a separate rating signal line for each possible rating. (*See* Exh. 2 [Elam Deposition Tr. at 70:17-71:13].) This admission is tantamount to a concession that the '584 patent does not cover televisions that implement parental control with microprocessors.

Nothing, however, deterred Schmidt from pressing forward with his scheme to extort royalties from the television industry. Schmidt partnered with H. Lee Browne because of Browne's experience both in intellectual property matters and in raising capital. (D.I. 404 [Facts], ¶ 6.) Together they acquired the '584 patent and, later, with additional cash from venture capitalists and patent profiteers at Acacia Research, formed Soundview. (D.I. 404 [Facts], ¶ 8; Exh. 3 [Article "Patent Profiteers"]; Exh. 4 [Article: "Studio Streaming: Sinister Purpose"].) With the patent in hand, they began lobbying the FCC to require manufacturers to incorporate "v-chips" in their televisions. And the FCC did ultimately pass such a law in the Telecommunications Act of 1996. Upon passage of the act, Schmidt, Browne and Soundview began the legal machinations required to capitalize on the market that had been created by government mandate. (D.I. 404 [Facts] at 12.)

**B.    Soundview Begins its License Campaign by Alleging Infringement by the EIA Standard, Ignoring the Actual Manner in which the Accused Televisions Performed Program Blocking**

Soundview never sold a product, embarking instead on a campaign to license the '584 patent to a consumer electronics industry that was required to implement the government-mandated V-chip standard. (D.I. 404 [Facts] at 16.) To assist them, in March of 1996, Browne contacted a patent attorney, Mr. Gerald Hosier. (D.I. 404 [Facts] at 17.) Adopting a low-effort approach to quick licensing dollars, Soundview and Hoiser began their shakedown of television manufacturers by baselessly asserting that the '584 patent covered the v-chip standard that the television industry adopted (EIA-608A), no matter how each individual manufacturer implemented it. For example, on April 30, 1998, while "v-chips" were still in their design phase, and more than a year before any of the Non-Soundview Parties would bring a parental control-equipped television to market, Hoiser asserted without any basis that:

> Among other features, the '584 patent protects, the exclusive property of Soundview, the use of the closed captioning channel in the U.S. standard television broadcast to convey program rating information …we are confident that your company has long been aware of the '584 patent and the fact that it covers the V-chip standard….

(Exh 5 [Hoiser Letter to Usami of Mitsubishi (4/30/98)]; Exh 6 [Hosier letter to Akita of Sony (also at Schmidt Depo. Exh. 100)(4/30/98)("[T]he claims . . . cover . . . V-Chip or parental control adapters designed to receive television broadcast transmissions transmitted in accordance with the adopted EIA608A V-chip system standard.")]; Exh 7 [Hoiser Letter to Saga of Toshiba (4/30/98); Exh 8 Hoiser letter to Kuratani of Sharp (4/30/98)]).

In his letters of April 30, 1998, Hoiser conspicuously did not address the "separate rating signal line[s]" limitation (or any of the other structural limitations of the claims of the patent for that matter). He did not because he could not. The v-chip standard only provides for the transport of content advisory information and is wholly silent on the issue of how televisions process the information to provide blanking. The EIA standard does not even mention, much less require, the use of a separate rating signal line for each different rating. (*See* Exh. 27 at 231:24 to 232:15 and *see also* 4:15 to 6:11, 8:2-10 and 220:11 to 222:22[Cummings Tr.](Cummings was Soundview's patent counsel and authored the licensing letters signed on behalf of Hosier.).)

What Soundview was doing was alleging infringement without ever having seen the accused devices. (*See* Exh. 9 at 362, 364-366 [Schmidt Tr]; Exh. 10 [Schmidt Depo. Exh. 76]; Exh. 11 [Leavy Depo. Exh. 32].) Even a year into its licensing campaign, Hoiser admitted that Soundview had not studied the accused televisions to determine whether the products infringed the '584 patent:

> At this time our client does not have sufficient information regarding Mitsubishi's implementation of V-Chip technology in its consumer television products to determine whether these products are infringing the subject patents. If you will provide us with details on Mitsubishi's implementation …we will attempt to make a determination on infringement.

(Exh. 12 [Hoiser Letter to Fehrman (7/2/99)]).

And, during this whole pre-filing period, Soundview was advising the press, the manufacturers, and stockholders of Acacia (which owns Soundview) that every television manufacturer must infringe the '584 patent by virtue of its adherence to the v-chip

standard.  (Exh. 9 at 366-367, 388-389, 415, 418 [Schmidt Depo.]; Exh. 13 [Schmidt Depo. Exh. 80].)  What makes this type of public licensing campaign particularly troubling is that, under penalty of perjury in the present case, suddenly Soundview could not find a requirement of separate rating signal lines in the v-chip standard.  (Exh. 9 at 410-411, [Schmidt Depo.]; Exhs. 14 and 15  [Schmidt Depo. Exh. 67 and 68].)  Soundview's Schmidt even conceded that the v-chip standard did not teach how to design or implement the character detector, which outputs to the separate rating signal lines.  (Exh. 9 at 539 [Schmidt Depo.].)

The closest Soundview ever got to directly addressing its patent's basic flaw was the concocted "pattern" argument.  Soundview asserted that "the bus signal lines in [the accused televisions] are the structural equivalent of and perform the same function as the program rating signal lines in the '584 patent."  (*See* Exh. 16 [Hoiser letter to Siegel (9/8/99)].).  The preposterous claim construction that this requires need not be explained to this Court, which summarily dismissed it when it reappeared in opposition to the Non-Soundview's Parties' successful motion for a summary judgment of non-infringement.  Soundview did not present this claim construction to the Special Master and only resurrected it before this Court after another argument submitted to the Special Master was flatly rejected.

**C.    Each Non-Soundview Party Notified Soundview Before the Lawsuit Was Filed that there was no Infringement and that Soundview's Actions Were Reckless; Yet Soundview Filed Anyway**

In response to the aforementioned ridiculous infringement contentions, the Non-Soundview Parties warned Soundview that its claims for infringement had no merit and

that its actions were reckless.  For example, on July 13, 1999, well before Soundview filed suit, Mitsubishi wrote:

> This is to place Soundview on notice that it believes that the <u>previous assertion of infringement by Soundview was made without probable cause and that such conduct is wrong and actionable</u>.  It was made in reckless disregard of the facts and based upon either clearly <u>insufficient investigation or no information</u>.  If Soundview proceeds against Mitsubishi Electric in a meritless action, it will be held accountable for all of Mitsubishi Electric's past and future expenses, its damages and attorneys' fees.

(Exh. 17 [Fehrman Letter to Hoiser (7/13/99)]) (emphasis added.)  The other Non-Soundview Parties provided similar notice to Soundview that its misguided threats of infringement, utter disregard of the facts and lack of any sufficient investigation were clearly actionable.  (*See*, *e.g.*, Exh. 18 [Siegel Letter to Hosier (11/9/98)]; Exh. 19 [Siegel Letter to Hosier (6/11/99)].); Exh 20 Nixon Letter to Hoiser (12/23/99)] Exh. 21 [Adams Letter to Hosier (11/9/99)("Sharp's chips do not utilize the claimed 'separate rated signal line' structure or function.")].).

Nonetheless, Soundview filed an infringement suit against Sony on April 5, 2000 in the Eastern District of Virginia and, after a subsequent transfer to Connecticut, added claims of infringement against the other Non-Soundview Parties as Third Party Defendants.

**D.    During the Course of the Lawsuit, Soundview Proceeded to Advance One Untenable Claim Construction After Another**

During the instant lawsuit, Soundview advanced one specious claim construction argument after another with respect to the limitation of separate rating signal lines to avoid facing the reality of its futile infringement position and to continue the litigation in hopes of extracting settlements.  Soundview continued to prosecute this action knowing full well that the none of its changing claim construction arguments for "separate rating signal lines[s]" had any merit and, under proper interpretation, the Non-Soundview Parties' televisions could not possibly be covered by the claims of the '584 patent.

**1.    First Interpretation of Separate Rating Signal Lines During Claim Construction**

Before the Special Master, Soundview advanced its first novel theory for "separate rating signal line[s]" ─ that the character for a given rating will activate *different internal lines within the character detector* and these internal lines were the separate rating signal lines.  Soundview asserted:

> When the claim refers to a "separate rating signal line for each character of said special set," that means the appearance of the first character in the sequence on the data bus will cause a separate <u>signal path</u> ("line") to be followed in the character detector [<u>i.e.</u>, internally] than will the appearance of the second character in the sequence…. These signal paths are called "*rating* signal lines" because in the aggregate, the two incoming bytes indicate to the rest of the circuitry what ratings data the broadcast signal contained.

(D.I. 230 at 16-17 [Soundview Claim Construction Brief](emphasis original).)  In other words, Soundview took the position that paths taken *internally* through the character

detector were the claimed "separate rating signal lines".  Soundview's fanciful construction had no relation whatsoever to the teaching of the '584 patent and was a transparent attempt to contort the claim language to avoid the clear requirement that there be a separate output line for each different rating, something Soundview knew full well was not present in the accused televisions.

**2.      Special Master's Rejection of Soundview's "Internal Path" Argument**

On July 9, 2001, the Special Master issued a report recommending that the Court adopt certain interpretations for various claim terms and phrases appearing in the '584 patent.  In his report, the Special Master determined that Soundview's novel "internal path" argument was completely unsupported by the language of the patent claim and the specification, which plainly require that there be a separate rating signal line for each different program rating character.  The Special Master soundly rejected Soundview's internal path argument, thus gutting its infringement claims.  (D.I. 284 at 44 [Report].)

Instead, the Special Master concluded that the claims of the '584 patent require a one-to-one correspondence between each rating character (*e.g.*, G, PG, R, etc.) and each rating signal line.  More specifically, the Special Master recognized that claim 1 (the patent's only independent claim) of the '584 patent expressly requires that the "auxiliary circuit" include "rating signal lines, there being a separate rating signal line for each character of said special set." (Exh. 22 at col. 9, lns. 38-41 ['584 patent] (emphasis added).)  The Special Master recommended that the Court adopt the following definition for this claim requirement:

> The "rating signal lines" receive the output from the "means for decoding * * * and output."  Claim 1 requires that there is "a separate

-13-

> rating signal line for each character of said special set" of characters,
> namely "a separate rating signal line" for receiving each "character"
> representing program content.

(D.I. 284 at 45 [Report]; *see also id.* at 65.)

Just as Mr. Elam had recognized years earlier, a microprocessor could *not* have a separate line for each different rating, and Soundview had no basis for its tortured construction which attempted to undo this limitation.

### 3.    Second Interpretation of Separate Rating Signal Lines in Opposition to Summary Judgment; Revisiting the "Pattern" Argument

After the Special Master issued his report, the Non-Soundview Parties moved to terminate this frivolous action and filed a motion for a summary judgment that they did not infringe the '584 patent because the accused televisions did not have "separate rating signal lines." (D.I. 328, 329.) Confronted with the motion, Soundview abandoned its internal path claim construction argument and tried a new one, or at least one that was never presented to the Special Master. This second nonsensical argument, similarly devoid of any merit whatsoever, is the "pattern" argument that Soundview's attorney Hosier had advanced in earlier licensing letters.

> Soundview argued:
>
> Nor does the use of the same physical material (the eight or sixteen
> conductors) as the rating signal line from one rating to the next refute
> the fact that *the distinct signal on the physical conductors* makes one
> rating signal line *a separate electrical structure* from another rating's.

(D.I. 338 at 19 [Soundview Opposition]) (emphasis original.) In other words, Soundview argued that a single rating signal line is formed of plural shared conductors and these

same conductors magically transform into a different, "separate" rating signal line each time there is a change of *data* on the conductors. Gone was the internal path argument, replaced instead with the "separate-but-shared-electrical-pattern argument" resurrected from Mr. Hosier's pre-suit letters.

### E.     This Court Rejected Soundview's Specious Infringement Claims

Soundview's second claim construction argument fared no better before this Court than did the first argument that it presented to the Special Master. This Court first noted that the claims mandated that "for each separate 'criteria relating to program content,' the character detector of an accused device must have one discrete rating signal line in order to infringe…." *Sony Elecs.*, 225 F. Supp. 2d at 174. The Court then considered and rejected Soundview's "separate but shared electrical pattern" argument, holding:

> Soundview's proposed construction of "rating signal lines" *lacks any support* in the text of the claims, and is *clearly belied* by the remainder of the specification. Nowhere are cable 56 or the "patterns" that are claimed to appear on cable 56 described as the indicator(s) of the program rating. To the contrary, all description of the "rating signal lines" point to the lines that cross cable 56…. Soundview's interpretation of "rating signal lines is *impaired by the absence of any indication in the claims or the specification* that a rating signal line means a "pattern" on cable 56, in light of the *explicit* language to the contrary in the [patent]….

*Id.* at 175. Thus, noting that "specification could not be clearer," the Court rejected Soundview's "clever attempt" as "without textual support in Claim 1" and "contrary to the description of the invention." *Id.* at 175-76.

Not only did the Court reject Soundview's "flawed" definition (*id.* at 176, 177), it concluded that Soundview's argument had no basis whatsoever in the teachings of the patent and "lack[ed] any support" (*id.* at 175, 176). Despite being soundly defeated on summary judgment, Soundview still pressed forward with its unfounded assertions in an appeal that could be nothing but fruitless.

## F.    Soundview's Refusal to Dismiss Its AntiTrust Claims

After the Court's judgment of non-infringement, Soundview recast its anti-trust claim in a failed attempt to preserve some leverage on the Non-Soundview Parties, most of whom are foreign companies. As plead, the antitrust claim was based on Soundview's allegation that "each of the counterclaim and third-party defendants, and numerous others in the industry, have openly and notoriously infringed the '584 patent." (DI. 7, ¶ 18 [Soundview's Answer To Philips' Complaint And Counterclaims And Third-Party Complaint (June 2, 2000)]). The finding of no infringement should have entirely disposed of Soundview's antitrust claim.

When asked to consent to a dismissal for purpose of appealing the non-infringement judgment, Soundview concocted a theory that its antitrust claim survived because the Non-Soundview Parties conspired not to take a license they did not need. (D.I. 448 at 21:10-14 [October 16, 2002 Hearing Tr].) This absurd logic, coupled with an even more absurd persistent nature forced yet another summary judgment submission by the Non-Soundview Parties.

To avoid a further waste of judicial resources and everybody's time, the Non-Soundview Parties requested that Soundview withdraw its anti-trust claim. (See,

-16-

*e.g.,* Exh. 23  [Sony's Oct. 10, 2002 Status Report].)  During an October 16, 2002 Status

Conference, the Non-Soundview Parties voiced their position that Soundview's anti-trust

claims were frivolous, noting:

> [I]t's going to be very expensive to go forward briefing [Soundview's]
> claim here, and we really believe, your Honor, and I just want to say
> for the record that this is a frivolous claim and we will brief it and we
> are confident that the Court will see it our way and we will be seeking
> some relief for putting us through this.

(DI. 448 at 30:11-17 [October 16, 2002 Hearing Tr].).  This Court also expressed

skepticism regarding Soundview's new anti-trust theory:

> THE COURT: . . . but what I'm still a little bit perplexed on, if it
> turns out that they didn't need a license in order to not infringe the
> patent, how can their collusion produce damages?
>
> [SOUNDVIEW]:  Well, they clearly wanted licenses, your Honor.
> I'm trying to get at the exact cause of your concern and better
> respond to it.

(DI. 448 at 7:17-23 [October 16, 2002 Hearing Tr].).

  The Non-Soundview Parties made one last attempt to convince Soundview to

withdraw its allegations and provided written notice that if Soundview did not, they

would seek attorneys' fees.  (Exh. 24 [Belusko letter to Niro (November 21, 2002)]).

Soundview, resorting to *ad hominem* attacks against the Non-Soundview Parties' counsel,

again refused.[3]  (*See e.g.,* Exh. 25 [Niro letter to Belusko (November 26, 2002)].)

---

[3] Soundview was also cautioned not to raise a baseless appeal.

On August 23, 2003, in an eight page opinion, this Court granted the Non-Soundview Parties' motion for summary judgment on Soundview's antitrust and unfair trade practices counterclaims.  *See Sony Elecs.*, 281 F. Supp. 2d at 399.

**G.     The Federal Circuit's Rejection of Soundview's Appeal**

Despite repeated failures, Soundview insisted in pursuing an appeal of both the infringement and antitrust summary judgment rulings of this Court.

With respect to the antitrust issue which Soundview had earlier forced the Non-Soundview parties to brief (*i.e.,*, the theory that there can be antitrust injury even when there is no infringement), Soundview *didn't even bother to challenge this Court's resolution of that issue on appeal.*   Instead, Soundview simply asserted that if there were infringement, there would then be an antitrust violation.  The Non-Soundview Parties, however, were still forced to address the issue on appeal.

With respect to the infringement issue, Soundview stuck with its "pattern" argument on appeal.  The Federal Circuit was apparently as unimpressed with this argument as was this Court, and affirmed the grant of summary judgment of non-infringement, without opinion, just three days after oral argument.  *See Sony Elecs.*, No. 04-1057, 2004 U.S. App. LEXIS 18406 (Fed. Cir. Aug. 11, 2004).

**ARGUMENT**

According to 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  There is no difference in the burden between plaintiff and defendant on this issue.  *See Eltech Sys. Corp. v. PPG Indus., Inc.,*

903 F.2d 805, 811 (Fed. Cir. 1990). The determination of whether a case is exceptional and, thus, eligible for an award of attorney fees under section 285, is a two part test. The Court must first decide whether the case is exceptional. After this determination is made, the Court must decide whether an award of attorney fees is appropriate. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998) (en banc).

    "[E]xceptional cases are typically those of bad faith litigation or those involving fraud or inequitable conduct by the patentee in procuring the patent."[4] *See Encomp, Inc. v. L-com, Inc.*, 999 F. Supp. 264, 266 (D. Conn. 1998) (citation omitted). However, "[e]xamples of exceptional cases brought in bad faith include misconduct during litigation, vexatious or unjustified litigation, or a frivolous suit." *Id.* (citation omitted). Bad faith litigation can also be found where a patentee brings and maintains a lawsuit alleging infringement of a non-infringed patent. In *Eltech*, the Federal Circuit held:

> Where, as here, the patentee is manifestly unreasonable in asserting infringement, while continuing to assert infringement in court, an inference is proper of bad faith, grounded in or denominated wrongful intent, recklessness, or gross negligence.

*See Eltech*, 903 F.2d at 811. "A frivolous suit is one which the patentee knew, or on reasonable investigation, should have know, was baseless." *Haynes Int'l, Inc. v Jessop Steel Co.,* 8 F.3d 1573, 1579 (Fed. Cir. 1993); *Encomp, Inc.*, 999 F. Supp. at 266. Moreover, inadequacy of pre-filing preparation may be relevant to the "exceptional" case

---

[4] The issue of Soundview's inequitable conduct in procuring the patent has not yet been decided. There is a claim for inequitable conduct. A two-day trial has been requested on this issue to establish further grounds for an award of attorney fees.

question.  *See Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358, 1377-78 (Fed. Cir. 2001).

"In the case of awards to prevailing accused infringers . . . 'exceptional cases' are normally those of bad faith litigation or those involving fraud or inequitable conduct by the patentee in procuring the patent."  *Cambridge Prods. v. Penn Nutrients Inc.,* 962 F.2d 1048, 1050-51, (Fed. Cir. 1992).  Importantly, an award of attorneys' fees falls within the sound discretion of the district court.  *See Orthopedic Equip. Co. v. All Orthopedic Appliances,* 707 F.2d 1376, 1384 (Fed. Cir. 1983).

In addition, attorneys' fees may be awarded pursuant to 28 USC § 1927, which provides that "any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Section 1927 thus authorizes the imposition of sanctions "when there is a finding of conduct constituting or akin to bad faith."  *Sakon v. Andreo*, 119 F.3d 109, 114 (2d Cir. 1997).  The Second Circuit Court of Appeals has held "that an award under [Section] 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay."  *60 E. 80th St. Equities, Inc. v. Sapir (In re 60 E. 80th St. Equities*), 218 F.3d 109, 117-19 (2d Cir. 2000) (imposition of monetary sanctions for vexatious multiplication of proceedings under 28 U.S.C. § 1927).

I.    **SOUNDVIEW'S PURSUIT OF THIS CASE WAS MERITLESS FROM THE START, RENDERS THE CASE "EXCEPTIONAL AND JUSTIFIES AND AWARD OF ATTORNEY FEES**

This is an exceptional case ─ exceptionally meritless from the very beginning. This lawsuit should never have been filed.  It should never have been pursued.  It should never have been appealed.  Neither this Court nor the Federal Circuit should have had to waste time on the merits of this case.  And the Non-Soundview parties should never have had to incur millions of dollars to defend against Soundview's frivolous infringement and antitrust charges.

A.    **Soundview Knew It Had No Legitimate Claim for Infringement Prior to Filing the Lawsuit.**

Soundview knew ─ and certainly should have known ─ that it had no meritorious case for infringement given the separate rating signal lines limitation of the claims of the '584 patent.  Yet, in a transparent attempt to shakedown the television industry and gambling that the television manufacturers (many of whom are foreign) would rather settle[5] than fight, Soundview filed an objectively and subjectively baseless suit and continued to prosecute its specious action at great expense to the Non-Soundview Parties.  This lawsuit is paradigmatic of why section 285 was drafted to permit an award of attorneys' fees.  Soundview was warned repeatedly that this day was coming, but Soundview continued down its reckless course, each day multiplying the expense to the Non-Soundview Parties.  The outrageous and irresponsible conduct displayed by

---

[5] Several manufacturers opted to succumb to Soundview's settlement offers rather than spend millions of dollars in defense and risk any uncertainty, providing Soundview with $26 million of ill-gotten gains.

-21-

Soundview and its attorneys must not be condoned or additional baseless actions will surely follow.

As early as 1994, Soundview should have known it had no legitimate claim for infringement of the '584 patent. David Schmidt and Carl Elam recognized at that time that there was a serious problem with applying the claims of the '584 patent, which all include the separate rating signal lines limitation, to a parental control system using a microprocessor implementation. But they proceeded anyway. Knowing full well that a microprocessor could not satisfy the separate rating signal line limitation, Soundview began is licensing shakedown with its first broad, baseless, and unsupported and uninvestigated assertion: that mere compliance with the v-chip standard would result in infringement of the '584 patent.

But Soundview had no possible foundation for its allegation that compliance with the standard was *per se* infringement. In fact, even a cursory examination of the standard reveals that it requires no structural requirement of separate rating signal lines. Soundview's infringement stance on the v-chip standard was the first of several completely unfounded positions it would take throughout the course of the lawsuit. That said, Soundview's bluff worked on a few litigation-adverse manufacturers who fell prey to the shakedown. The resolute Non-Soundview Parties, however, would not succumb to these ridiculous accusations.

When the "compliance with the standard" allegation failed to net Soundview all the undeserved license fees that it craved, it shifted to a second and equally baseless allegation": literal infringement by microprocessors through the "pattern" argument.

-22-

Soundview should have known ─ and did know ─ that it had no reasonable infringement position in light of the "separate rating signal line[s]" limitation of the claims of the '584 patent, yet it filed suit anyway. *See Superior Fireplace Co.*, 270 F. 3d at 1377-78.

     **B.    Soundview's Conduct During The Litigation Was Reckless and Resulted in Vexatious Multiplication of Proceedings**

Because of the structural limitations of the claims of the '584 patent regarding rating signal lines, Soundview was forced to advocate a tortured claim interpretation if its infringement allegations were it to have any hope of succeeding. In doing so, Soundview proposed before this Court not one, but two, mutually exclusive interpretations of this limitation, in an effort to pound the proverbial square peg into a round hole.

Having cobbled together a new claim construction that must have sounded a little more believable to Soundview's attorneys, Soundview put aside the "pattern" argument for a moment and argued to the Special Master that the "separate rating signal line" limitation is an "internal electrical path" present in the character detector. This specious, infringement-oriented construction, however, fell on deaf ears, forcing Soundview to shift tactics and again change its proposed construction in an effort to avoid this dispositive limitation.

Soundview's next construction, was a return to its licensing letters: a separate rating signal line is really a separate electrical pattern. This similarly meritless construction was summarily rejected by this Court. That rejection was affirmed after a mere three days (indeed, the next business day) by the Federal Circuit. Of paramount importance here is that Soundview charged ahead, flip-flopping on its positions, while the

-23-

Non-Soundview Parties expended enormous amounts of time and money responding to ridiculous claim construction theories.  In light of these facts, this case is truly exceptional under sections 285 and 1927.

### C. Soundview Had Multiple Opportunities To Rescind Its Reckless Charges But Did Not

This Court should award attorneys' fees to deter further conduct such as was evidenced in this case.  The Court's summary judgment ruling and the Federal Circuit's immediate affirmation confirms, albeit expensively, what the Non-Soundview Parties had told Soundview before the lawsuit was ever filed, that there was no possible way infringement could lie.  As the suit progressed and Soundview's outrageous positions began to fail again and again, it was completely unreasonable for Soundview to continue to maintain that it had a meritorious case.  Yet it continued to press its baseless assertions time and time again.

Soundview could have withdrawn its allegations after the Special Master rejected its internal electrical path theory, thereby dooming its infringement position.  But it didn't.  Soundview could have stopped after discovery on the Non-Soundview Parties' televisions confirmed that there was no possible way in which the separate rating signal lines requirement could be satisfied by a microprocessor implementation.  But it chose to press forward.  Soundview could have ended the litigation after the summary judgment ruling of non-infringement exposed the ridiculousness of its position.  Instead, it pressed its antitrust claims, forcing yet another round of summary judgment briefing.  Having lost on appeal, Soundview has not timely paid the costs incurred by the Non-Soundview Parties during the appeal.  (Exh.  26 [Makin letter to Hosier (Nov. 22, 2004)].).

Each time Soundview declined to withdraw its suit and continued to proceed in bad faith, the Non-Soundview Parties paid a huge price. *See Encomp, Inc.*, 999 F. Supp. at 266. Since the inception of this lawsuit, Soundview has repeatedly been made aware that the day would come when the vindicated Non-Soundview Parties would seek recompense for its reckless course of conduct. That day is here. Soundview's actions mandate an award of attorneys' fees. *See Eltech Sys. Corp.*, 903 F.2d at 811.

## II.    SOUNDVIEW'S CONTINUED ASSERTION OF ANTITRUST CLAIMS AFTER THE COURT'S FINDING OF NONINFRINGEMENT WAS "VEXATIOUS" AND HARRASSING," RENDERS THE CASE "EXCEPTIONAL AND JUSTIFIES AN AWARD OF ATTORNEY FEES

Soundview's antitrust arguments were utterly without merit; once the Court determined that there was no infringement of the '584 patent, the arguments became palpably frivolous. This total lack of a colorable argument on the part of Soundview was evidenced by the evaporation at the Federal Circuit of Soundview's insistence on an antitrust theory that could survive this Court's non-infringement ruling. Soundview's about-face not only made the Non-Soundview Parties' Federal Circuit briefing and oral argument preparation a waste of time and money, but it also belied all of Soundview's bluster before this Court. Indeed, after stating to Soundview that it was "perplexed" on how any collusion by the Non-Soundview Parties could lead to the requisite antitrust damages to maintain its claim, the Court asked Soundview directly:

> THE COURT:  So you believe you can continue to prosecute your antitrust claim no matter what the outcome is on appeal of the non-infringement … decision.

> [SOUNDVIEW's COUNSEL]:  That's right, your honor.

(D.I. 448 at 10:5-9 [October 16, 2002 Hearing Tr].).

Based on that representation, the Non-Soundview Parties were forced to spend money on this frivolous claim both here and at the Federal Circuit. And, on appeal, Soundview didn't even bother to argue that there could be antitrust damage without infringement. Soundview never had a colorable antitrust argument once its infringement argument was defeated.

Soundview cannot be allowed to besmirch the integrity of the adversarial process by levying frivolous allegations, harassing defendants and maintaining those allegations long after they were known to be hollow. Soundview's conduct with respect to the antitrust claim is the most blatant example of the impropriety of its actions. Soundview should at the very least be ordered to reimburse the Non-Soundview Parties fees in connection with the briefing and argument on Soundview's antitrust claims.

## CONCLUSION

As set forth above, Soundview baselessly asserted infringement of the '584 patent and continued to recklessly prosecute this action causing the Non-Soundview Parties to unnecessarily incur large attorneys' fees and costs in defending this action. Because Soundview knew or should have known that it had no good faith infringement contentions, the Non-Soundview Parties respectfully request that the Court grant their motion awarding reasonable attorneys fees in defending against Soundview's baseless infringement charge as well those incurred in connection with briefing and arguing the antitrust issue.

The Non-Soundview Parties respectfully request that their motion for attorney fees be granted, they be granted leave to submit their proofs of the actual amounts of attorney fees incurred, and a schedule be entered for submitting proof of the actual amounts of attorney fees incurred.

December 8, 2004

Respectfully submitted,

Of Counsel:

By: _____

Richard L. DeLucia
Richard S. Gresalfi
Elizabeth A. Gardner
Thomas R. Makin
Kenyon & Kenyon
One Broadway
New York, NY
Tel: 212-425-7200
Fax: 212-425-5288

William M. Bloss
KOSKOFF, KOSKOFF & BIEDER
350 Fairfield Avenue
Bridgeport, Connecticut 06604
Tel: 203-336-4421
Fax: 203-368-3244

Vincent J. Belusko
Robert S. McArthur
MORRISON & FOERSTER LLP
555 W. Fifth Street
Los Angeles, CA 90013
Tel: 213-892-5200
Fax: 213-892-5454

Jacqueline D. Bucar (CT01187)
TYLER COOPER & ALCORN
205 Church Street
New Haven, CT 06509
Tel: 203-784--8200
Fax: 203-789-2133

Larry S. Nixon
Jeffry H. Nelson
Robert Adams
NIXON & VANDERHYE P.C.
1100 N. Glebe Road
Arlington, VA 22201
Tel: 703-816-4000
Fax: 703-816-4100

Brian E. Moran
ROBINSON & COLE LLP
Financial Centre
695 East Main Street
Stamford, CT 06904-2305
Tel: 203-462-7500
Fax:  203-462-7599

Peter J. Kadzik
DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP
2101 L Street NW
Washington, DC 20037-1526
Tel: 202-785-9700
Fax: 202-887-0689

Attorneys for Sony Electronics Inc. and
Sony Corporation of America and on
behalf of the Non-Soundview Parties

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed by first class mail, postage prepaid, to the parties listed below on this 8th day of December, 2004:

Counsel for Soundview Technologies, Inc.

Raymond P. Niro, Esq.
Robert P. Greenspoon, Esq.
Niro, Scavone, Haller & Niro
181 West Madison Street, Suite 4600
Chicago, Ill.
Fax: 312-236-3137

John J. Bogdanski, Esq.
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT 06114
Fax: 860-522-9549

Counsel for Consumer Electronics Association & Electronic Industries Alliance

Peter J. Kadzik, Esq.
Dickstein Shapiro Morin & Oshinsky
2101 L Street, NW
Washington, DC 20037

Jacqueline D. Bucar, Esq.
Tyler Cooper & Alcorn
205 Church Street
New Haven, CT 06509

Counsel for Mitsubishi Digital Electronics America

Vincent Belusko, Esq.
Morrison & Foerster LLP
555 West Fifth Street, 35th Floor
Los Angeles, CA 90013-1024

Joseph L. Clasen, Esq.
Brian E. Moran, Esq.
Robinson & Cole, LLP
695 East Main Street
P.O. Box 10305
Stamford, Connecticut 06904-2305

Counsel for Sharp Electronic Corporation

Robert W. Adams, Esq.                Robert W. Adams, Esq.
U.S. Mickey Gill, Esq.               Larry Nixon, Esq.
Nixon & Vanderhye, P.C.              Nixon & Vanderhye P.C.
1100 North Glebe Road, 8th Flr.   1100 North Glebe Road, 8th Floor
Arlington, VA 22201-4714             Arlington, Virginia 22201-4714

Counsel for Sony Electronics, Inc.

Jacqueline D. Bucar, Esq.            Richard S. Gresalfi, Esq.
Tyler Cooper & Alcorn, LLP           Richard I. Delucia, Esq.
205 Church Street                    Elizabeth A. Gardner, Esq.
P.O. Box 1936                        Kenyon & Kenyon
New Haven, CT  06509-1910            One Broadway
                                     New York, NY 10004

William M. Bloss
KOSKOFF, KOSKOFF & BIEDER, P.C.
350 Fairfield Avenue
Bridgeport, Connecticut 06604
Tel: 203-336-4421
Fax: 203-368-3244
Email:  bbloss@koskoff.com