UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SONY ELECTRONICS, INC., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | LEAD DOCKET NO. |
| | ) | 3 :00-C V-00754 (JBA) |
| | ) | U.S.D.C./New Haven |
| SOUNDVIEW TECHNOLOGIES, INC., et al. | ) | |
| | ) | ALL CASES |
| Defendant | ) | |
| | ) | February 28, 2005 |

**SHARP ELECTRONICS CORPORATION'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
<u>REGARDING SHARP'S REQUEST FOR ATTORNEYS FEES</u>**

I.     <u>Introduction</u>

1.     A hearing was held by this Court on March 28-29, 2005 with respect to the request by Sharp Electronics Corporation (Sharp) for an award of its reasonable attorneys fees pursuant to 35 U.S.C. §285 based upon the issue of inequitable conduct of Soundview Technologies, Inc. (Soundview) arising during the reexamination proceeding concerning the patent in suit.  In addition, Sharp's request for attorneys fees is also based upon the previously filed motion for attorney fees that was submitted by all of the non-Soundview parties.  That motion generally relates to the issue of bad faith litigation.

2.     This Court may award reasonable attorneys' fees under 35 U.S.C. §285 based upon (1) in equitable conduct before the USPTO, (2) vexatious, unjustified or bad faith ligitation,

or (3) a combination of both issues. *Forest Laboratories, Inc. v. Abbott Laboratories*, 339 F.3d 1324, 1329-30 (Fed. Cir. 2003). Sharp has elected to rely upon both issues in seeking its award of reasonable attorneys fees.[1]

3.      Soundview has received over $24 million dollars in license fees with respect to the patent in suit and Sharp is seeking to recover approximately $2 million in legal fees that it has paid in the course of its defense in this litigation.

## II.    General Background

4.      The patent in suit, U.S. Patent No. 4,554,584 (the '584 patent), issued to Messrs. Carl Elam and Dale Leavy on November 19, 1985. The '584 patent originally contained 14 claims. During later reexamination proceedings, claims 15-31 were added. Only claim 1 is an independent claim and all of the other claims 2-31 are dependent either directly or indirectly upon claim 1. [Sharp Ex. 1]

5.      Many years subsequent to the issuance of the '584 patent, Soundview embarked upon a strategy of purchasing patents or developing inventions allegedly relating to V-chip technology with the intent of using those patents to license and/or sue the television industry. [Sharp Ex. 14, at 23-24, 70-71, 73-74, 76-79, 94, 97, 110-111, 127-129, 205-206]

---

[1]   Soundview's motion to dismiss Sharp's request for attorneys fees must be denied because "inequitable conduct is a substantive patent issue that <u>must be taken into consideration</u> in determinations under 35 U.S.C. § 285." *Pharmacia & Upjohn Co. v. Mylan Pharmaceuticals, Inc.*, 182 F.3d 1356, 1359-60 (Fed. Cir. 1999) (emphasis added). See also *A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307, 1312-13 (Fed. Cir. 1988), where the Federal Circuit held that the district court erred when it did not make this type of an inequitable conduct determination. Cf.

908986

6.      As a part of this strategy, Soundview purchased the '584 patent.  [Sharp Ex. 14, at 23-24]  Further, as Soundview has repeatedly told this Court, it has received more than $24 million dollars in license royalties with respect to the '584 patent.  Significantly, this Court previously granted summary judgment in favor of the non-Soundview parties based upon the premise that "no television manufacturer produces a product requiring a license under the ['584] patent."  *Sony Electronics, Inc. v. Soundview Technologies, Inc.*, 281 F.Supp.2d 399, 401 (D. Conn. 2003).  Therefore, Soundview's patent acquisition and licensing strategy resulted in a windfall to it of over $24 million in royalties from companies that settled this case to avoid the high cost of patent litigation.

7.      Prior to instituting litigation against the television manufacturers (which ultimately led to this windfall of $24 million), Soundview conducted a prior art search relating to the '584 patent.  This search uncovered a number of previously uncited prior art references including patents to Chard and Keiser.  As a result of this search, Soundview filed a request for reexamination of the '584 patent on August 1, 1996.  [Sharp Ex. 14, at 226, 234]  The request for reexamination includes a specific statement that the previously uncited prior art raises substantial new issues of patentability.  The USPTO granted Soundview's request for reexamination based upon these new issues.  [Sharp Ex. 2, at TOS 110 and TOS 150-154]

8.      As is relevant here, the USPTO issued an Office Action on May 2, 1997.  Significantly, this Action found that many of the claims, including the only independent claim in

---

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395-96 (1990), and cases cited therein.

908986

the patent, were unpatentable in view of various prior art references.  One reference upon which the rejection was based is the Chard patent (U.S. Patent No. 4,605,964), which has a publication date of June 23, 1983.  In addition to this Chard patent, the USPTO held claims 1-5 to be unpatentable in light of other prior art, either alone or in combination with Chard.  This other prior art includes (1) the Keiser patent, U.S. Patent No. 4,390,901, (2) publications relating to the U.S. Closed Captioning System and (3) various publications relating to the British Teletext System.  [Sharp Ex. 2, at TOS 155-164]

9.    In order to overcome the rejections to the claims made by the USPTO, Soundview filed a Response to Office Action dated July 2, 1997.  [Sharp Ex. 2, TOS 190-209]  This Response includes, *inter alia*, a Declaration Under Rule 131 signed by both of the inventors, Messrs. Elam and Leavy.  [Sharp Ex. 2, at TOS 166-189 and TOS 203-204]  It is this July 2, 1997 Response and the attached Rule 131 declaration that form the basis for the charge of inequitable conduct.  In this regard, a patent is "by its very nature … affected with a public interest."  *Precision Instr. Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 808, 816 (1945).  Accordingly, those who apply for patents or who reexamine patents have a duty of candor and good faith that must be complied with in all respects such that any breach can constitute "inequitable conduct" rendering the entire patent unenforceable.  See *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1561 (Fed. Cir. 1984).  Significantly, during the reexamination process, Soundview (via its officer and director, Mr. Schmidt) was specifically aware of this duty of candor and good faith.  [Sharp Ex. 14, at 48-49]

908986

**III. Soundview Engaged in Inequitable Conduct
By Filing an Admittedly False Rule 131 Declaration
Combined With Its Failure to Properly Investigate
the "Facts" Set Forth in the Declaration**

10.     In order to understand the issue of inequitable conduct as alleged by Sharp, it is

necessary to look at three parts of this July 2, 1997 Response and the concurrently filed Rule 131

declaration.  First, the Court examined the arguments made by Soundview as to the scope of

claim 1.  Second, the Court examined the arguments that Soundview made to distinguish all of

the prior art references other than Chard.  And, third, the Court examined the Rule 131

Declaration wherein the inventors claim that they reduced the invention to practice before June

23, 1963, the effective publication date for the Chard patent.

**A.     Soundview Admits That Claim 1 Requires
That the Rating Codes Be Included Within
the Closed Captioning Data Stream**

11.     Soundview's July 2, 1997 Response demonstrates in at least three places that the

rating codes of claim 1 must be included or "interleaved" within the closed captioning data

stream.  At page 13 of the Response, Soundview admits that "Applicants' invention is directed to

a system for conveying program rating information within the closed captioning system."  In

addition, it states that "Applicants utilize a special set of single byte characters [for the rating

information] which are sent serially with the textual ASCII Closed Captioning characters to

indicate rating information."  [Sharp Ex. 2, at TOS 202; Sharp Demo. Ex. 3; and see also the

testimony of the inventor, Mr. Leavy confirming that "Applicants' invention is directed to a

system for conveying program rating information within the closed captioning system" in Sharp

Ex. 22, at 166-167]

12.     Thereafter, on page 15 of that Response [Sharp Ex. 2, at TOS 204; Sharp Demo.

Ex. 4], Soundview reiterates this scope of claim 1 by pointing out that:

> "… claim 1 calls for the system to include means for decoding
> predetermined digital codes of a special set of characters (col. 9,
> lines 38-39), so that program rating information can be sent serially with
> the data stream of the closed captioning system."

13.     Further entrenching itself, on page 18 [Sharp Ex. 2, at TOS 207; Sharp Demo. Ex.

5], Soundview again states that the rating codes <u>must be sent</u> in the closed captioning data stream

and that the ratings codes <u>must not correspond</u> to any characters used for captioning or text.  In

other words, they must truly be "special" as required by claim 1.  Soundview stated:

> "At col. 9 lines 15-19 the specification requires that the rating codes not
> correspond to any of the characters used for captioning or text.
>
> > Note that the captioning or text feature of the TV receiver can be
> > used at the same time as the auxiliary rating circuit.  The rating
> > codes must be chosen such that they do not correspond to any of
> > the characters used for captioning or text.  (Col. 9 lines 15-19)
>
> Thus, as defined in the specification, the special set of characters called for
> in claim 1 comprise a set of characters transmitted along with the closed
> captioning data stream …."

14.     By law, these arguments and/or statements as to the scope of claim 1 are binding

on Soundview and it is estopped from arguing that claim 1 has a different scope.  *Storage*

*Technology Corp. v. Cisco Systems, Inc.*,  329 F.3d 823, 836 (Fed. Cir. 2003) (claim scope

estoppel arises from arguments made during patent prosecution); *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999) (holding that the scope of the coverage of claims may change if a patentee has "relinquished [a] potential claim construction … in an argument to overcome or distinguish a reference"); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1583 (Fed. Cir. 1995) ("Clear assertions made during prosecution in support of patentability, whether or not actually required to secure allowance of the claim, may create an estoppel").

15.     Indeed, as to the statement in paragraph 13 herein, Soundview has admitted that this "excerpt is correct in its characterization of the invention, and completely unimpeached." [Sharp Ex. 16, para. 57]  Thus, Soundview has admitted that the entire invention of the patent in suit must be characterized in this manner.

**B.      Soundview Distinguished the Cited Prior Art (Other Than Chard) on the Ground That They Do Not Teach That the Rating Code Information Is <u>Sent Within the Closed Captioning Data Stream</u>**

16.     The importance of incorporating the rating code information within the closed captioning data stream also was emphasized by Soundview throughout the July 2, 1997 Response with respect to distinguishing the teachings of various prior art cited by the USPTO (other than the Chard patent) in order to overcome the rejection of the claims.

17.     For example, Soundview contrasted "the system of the present invention" from the prior art Keiser patent by stating that the '584 patent invention sends "program rating

information using a special character set which is transmitted in the closed captioning data stream without disturbing the transmitted data." [Sharp Ex. 2, at TOS 199; Sharp Demo. Ex. 6]

18.     Likewise, with respect to the prior art U.S. Closed Captioning System, Soundview criticized the citation to that prior art by stating that "there is no showing or suggestion of how non-captioning data, such as a program rating, can be incorporated into the Closed Captioning data stream." [Sharp Ex. 2, at TOS 200; Sharp Demo. Ex. 7]

19.     Similarly, the prior art articles relating to the British Teletext system were dismissed by Soundview because "None of these technical articles shows or suggests the use of a special character set from which the receiver can directly extract the program rating from the continuous data stream of the U.S. closed captioning system." [Sharp Ex. 2, at TOS 202; Sharp Demo. Ex. 8]

20.     As a result of the arguments made by Soundview's counsel to explain the scope of the '584 patent invention and to distinguish various prior art (other than Chard), there can be no doubt that Soundview and its counsel were well aware of the importance of the requirement that the ratings program information be sent within the closed captioning data stream. See, e.g., Sharp Ex. 17, showing that Soundview's Mr. Schmidt was aware of these arguments prior to the filing of the July 2, 1997 Response. These arguments are important in view of the Rule 131 declaration that was filed with the July 2, 1997 Response.

908986

**C.     The Rule 131 Declaration That Was Filed
To Swear Behind the Chard Patent Makes
False Statements as to the Conception Date
and, More Importantly, Falsely Alleges a
Reduction to Practice of the Invention by no
<u>Later Than May 12, 1982</u>**

21.     Soundview did not make any arguments to distinguish the Chard patent based

upon its teachings.  Rather, Soundview filed a Rule 131 Declaration to "swear behind" the

publication date of Chard – *i.e.*, June 23, 1983 – and to thereby remove it as a cited reference.

[Sharp Ex. 2, at TOS 165, TOS 166-189 and TOS 204]

22.     Rule 131 (CFR §1.131) provides a means by which a patent applicant could

overcome a cited prior art by filing a declaration to "swear behind" the date of a cited prior art

reference.  In 1997, Rule 131 provided in pertinent part that:

> "(b)  The showing of facts shall be such, in character and weight, as to
> establish reduction to practice prior to the effective date of the reference,
> or conception of the invention prior to the effective date of the reference
> coupled with due diligence from prior to said date to a subsequent
> reduction to practice or to the filing of the application.  Original exhibits
> of drawings or records, or photocopies thereof, must accompany and form
> a part of the affidavit or declaration …."  [Sharp Ex. 15]

23.     The Rule 131 Declaration of the inventors contains a false statement with respect

to the date of conception and a false statement alleging reduction to practice prior to June 23,

1983, the effective filing date of Chard.  [Sharp Ex. 2, at TOS 167]

24.     More specifically, the inventors, Messrs. Elam and Leavy, admitted during their

depositions that the date of conception listed in the Disclosure and Record of Invention

document attached to the Rule 131 declaration was not based upon any legal definition of conception, that they were unaware of the legal definition of conception, and that, if Mr. Elam had to list a date now, he would not identify the conception date as May 25, 1981 because that was before he starting working on the invention with Mr. Leavy.  [Sharp Ex. 9, at 218-220, 125, 126, 302, 530, 532-533, 552, 553-554; Sharp Ex. 22, at 138-141, 184-185]

25.    Indeed, in its proposed findings of fact relating to a previously filed summary judgment motion, Soundview expressly admitted that the inventors' Rule 131 declaration is based upon a conception date that is not accurate.  See Sharp Ex., 16, paras. 26 and 27.  Thus, there is no dispute in the record that the date of conception cited to the USPTO in the Rule 131 declaration is wrong.

26.    Despite the extreme importance of the Rule 131 declaration in overcoming the citation to Chard, no one asked the inventors any questions as to the correctness of the date of conception relied upon in the Rule 131 declaration.  Rather, the inventors were left without any guidance as to the legal meaning of the term "date of conception."  [Sharp Ex. 9, at 218-220; Sharp Ex. 22, at 138-141 (no advice from lawyers and the date of conception is prior to when Leavy got involved)]

27.    While there is no need of an attorney to pursue a fishing expedition for information, if there is a reason to doubt the accuracy of information or the adequacy of the client's understanding, then the attorney must conduct a reasonable investigation into the matter. *Brasseler, U.S.A., I., L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1382-1383 (Fed. Cir. 2001).

908986

Thus, conduct beyond mere gross negligence will support a finding of inequitable conduct. Here, the fact that the date of conception was prior to the date when the inventors started to work together on the invention should have raised a "red flag."

28.     In that connection, the USPTO Rule 555 imposes a heavy duty of candor and good faith upon all persons involved in a reexamination proceeding, including the patent owner (Soundview), each attorney involved in the proceeding and the inventors.  [Sharp Ex. 15] Indeed, the Rule indicates that compliance with this section rests upon these persons and no evaluation will be made by the USPTO as to compliance.  [Sharp Ex. 15]  In other words, the USPTO relies upon the inventors, patent owners and attorneys to fully comply with their duty of candor and good faith.  Here, the attorneys handling the reexamination were aware or should have been aware that the inventors were not familiar with patent law definitions for "date of conception" and "reduction to practice."  [Sharp Ex. 9, at 218-220, 234; Sharp Ex. 22, at 138-141, 184-185]

29.     In addition, other "red flags" were raised in the Disclosure and Record of Invention that should have led to a detailed investigation of all dates disclosed on the third page of that document.  For example, the document indicates that the invention "was disclosed to others" on 1 June 1981.  Because a public disclosure of the invention to others more than one year prior to the filing date of the patent application can in some circumstances invalidate the patent [Sharp Ex. 12, at 71-72], the attorneys preparing the Rule 131 declaration should have seen this statement as demonstrating a need to investigate not only this date of disclosure (which

was more than 2 years prior to the filing date of the '584 patent application), but also the other

dates listed next to it – *i.e.*, the date of conception and the date of first construction of model

(which Soundview alleges is the date of "reduction to practice").  In other words, the responses

on that Disclosure and Record of Invention Form were "red flags" and they were not statements

to be blindly cited to in a Rule 131 declaration without careful attorney investigation of the facts

and the law.  [Sharp Ex. 13, at 80-81]

       30.    Although Soundview now argues that this wrong date of conception is irrelevant,

Soundview cannot seriously argue that the date of conception is not a material fact that was

considered by the USPTO.  Indeed, whether another later date of conception would be proper is

not the standard by which the duty of candor and good faith is measured.  Otherwise, anyone

could file false declarations and then later say that "other facts" made the statements irrelevant.

In short, a court may find inequitable conduct even where it "cannot determine what the outcome

of the prosecution would have been in the absence of the examiner's reliance on [applicant's]

misrepresentations."  *Li Second Family Ltd. v. Toshiba Corp.*, 231 F.3d 1373, 1380 (Fed. Cir.

2000).  Here, the false statement in the Rule 131 declaration took away the opportunity of the

USPTO to consider alternative outcomes based upon different facts and arguments.

       31.    By law, representations of fact to a patent examiner are inherently material.  *Refac*

*International Ltd. v. Lotus Development Corp.*, 81 F.3d 1576, 1583 (Fed.Cir. 1996); *General*

*Electro Music Corp. v. Samick Music Corp.*, 19 F.3d 1405, 1411 (Fed. Cir. 1994); *Rohm & Haas*

*Co. v. Crystal Chemical Co.,* 722 F.2d 1556, 1571 (Fed.Cir. 1983) ("In contrast to cases where

12

908986

allegations of fraud are based on the withholding of prior art, there is <u>no room to argue that submission of false affidavits is not material</u>."), *cert. denied*, 469 U.S. 851 (1984) (emphasis added).  As a result, false factual statements are clearly the type of information a reasonable examiner would have considered important.  See, *e.g.*, *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1257 (Fed. Cir. 1997);  *In re Jerabek*, 789 F.2d 886, 890 (Fed.Cir. 1986);  37 C.F.R. §§1.56 and 1.555.

     32.     An extremely important false statement in the Rule 131 declaration relates to the date of reduction to practice of May 12, 1982 that is cited in that declaration.  In this regard, Soundview admitted in its pleadings submitted on a motion concerning inequitable conduct that the Rule 131 declaration unequivocally states that <u>May 12, 1982 is the latest possible date of reduction to practice</u>.  More specifically, the pleading [Sharp Ex. 16, para. 36] states:

> "… that the May 12, 1982 date of reduction to practice is the <u>latest</u> possible date of invention for all of the claims, and since this date is clearly earlier than Chard, the '584 patent's "date of conception" is non-relevant. *** No reasonable examiner would have cared what the true legal date of conception was once the patentee established a date of reduction to practice [May 12, 1982] that is earlier than the prior art [Chard] reference's effective date."

     33.     Consistent with this Soundview admission and looking specifically at the Rule 131 declaration [Sharp Ex. 2, at TOS 166-189], the inventors only identify the May 12, 1982 construction of the first model as the basis for the date of reduction to practice.  Thus, with respect to the requirement of Rule 131 to cite "facts", the only fact identified in the text of the Rule 131 declaration as to the date of reduction to practice is the citation in the Disclosure and

Record of Invention document on page 3 to "Date First Construction Of Model Was Made" which is listed as May 12, 1982. [Sharp Ex. 2, at TOS 167-168]

34.     Significantly, the attorney opinion letter that Soundview obtained prior to filing the Rule 131 declaration states that the Disclosure and Record of Invention document "also indicates that the invention was reduced to practice by May 12, 1982." [Sharp Ex. 18, at page 2] This document further confirms that when Soundview filed its Rule 131 declaration it was indicating that May 12, 1982 was the date of reduction to practice that Soundview and the inventors were relying upon to overcome the prior art Chard patent.[2]  [See also Sharp Ex. 12, at 113-114, 116-117]

35.     While Soundview relies upon this opinion letter as "good faith" support for its actions, it is noteworthy that the Disclosure and Record of Invention nowhere uses the term "date of reduction to practice."  Rather, it merely refers to the "Date First Construction Of Model Was Made."  On its face, this ambiguous language also raised "red flags" as to what was done.  For example, was this a working model and what was the structure and operation of the model that was built?  Indeed, based upon the clear language in the July 2, 1997 Response that claim 1 requires that the rating code information be conveyed within the closed captioning data stream and that this was the basis for distinguishing the other prior art, it would have been imperative to

---

[2]  Contrary to these plain statements/admissions, it appears that Soundview now may be arguing that there was a different date of reduction to practice.  This argument is a hindsight revision of the language of the Rule 131 declaration and the attached Disclosure and Record of Invention.

ask the inventors whether this "model" actually did "interleave" rating code information in the closed captioning data stream and whether the rating code information was not chosen from alphabetical characters already used in the closed captioning data stream.  Apparently, none of these questions were asked.  [Sharp Ex. 12, at 154-156, 161-163]

36.    Based upon the answers given by the inventors, Messrs. Elam and Leavy, during their depositions, there is no evidence that anyone ever presented them with a legal definition for "reduction to practice."  [Sharp Ex. 9, at 234, 275-279, 303, 327-328, 332-333; Sharp Ex. 22, at 138-141, 184-185]  Moreover, when inquiries were made during deposition to the attorney who provided the opinion letter to Soundview as to these "red flag" questions, counsel for Soundview instructed the attorney not to answer these important questions.  [Sharp Ex. 12, at 60-62, 64, 65-66, 67-69, 76-78, 87-93, 127-129, 133-135]  Even more telling, when Mr. Elam was asked whether he ever discussed the attributes of his invention with the Soundview lawyers, he also was instructed not to answer.  [Sharp Ex. 9, at 272, 292-295]  Having made these instructions, Soundview cannot now (after the close of discovery and during trial) supply contrary testimony in an effort to avoid an adverse ruling on inequitable conduct.

37.    These "red flag" questions should have been asked in 1997 in connection with the preparation and filing of the Rule 131 declaration because during the 2001 deposition of Mr. Elam, he readily admitted that the rating code information was never conveyed or "interleaved"

---

Significantly, no date of reduction to practice is identified in the text of the Rule 131 declaration other than May 12, 1982.

with the closed captioning data stream until that very same year.  [Sharp Ex. 9, at 551]

Specifically, he unequivocally stated that he was not able to do this "interleaving" in 1982, in

1986, 1989 and in 1995.  [Sharp Ex. 9, at 78-79, 551]  The reason he could not do it was because

(1) he did not have either the closed captioning software or the equipment that was necessary to

do so and (2) he did not know where to place the rating codes in the closed captioning data

stream and he conceded that "the placement of the data [rating codes] was critical."  [Sharp Ex.

9, at 81-82, 83-85, 201, 392-400, 487-489, 498-500, 506-507, 548-550, 551]

38.     In particular, at his July 21, 2001 deposition, he succinctly summarized this

admission by stating:

> "A.     In '95 I did not attempt to interleave at that point in time closed
> captioning and rating codes.
> Q.     Have you ever attempted to interleave?
> A.     Yes.
> Q.     When was that?
> A.     Within the last month
> Q.     So for the first time within the past month you have attempted to
> interleave rating codes and closed captioning; is that correct?
> A.     Yes."                    [Sharp Ex. 9, at 551]

In addition, he candidly admitted that:

> "Q.     What would have happened if the [rating] codes weren't properly placed?
> A.     Then the best answer I can give is the television would respond if – if it's
> displaying closed captioning and closed captioning is being sent, it would respond
> in the same way that it would respond if you misplaced any legitimate control
> character.
> Q.     So it would interrupt the display of the closed captioning?
> A.     I think it – what it does is it freezes it until it gets a proper preamble code.
> Q.     So it would remain frozen until it got that proper preamble code?
> A.     Right.  Or you flipped registers.

908986

> Q.    In 1995 did you know where to place the rating codes?
> A.    No."                    [Sharp Ex. 9, at 507]

39.    A "reduction to practice" requires that a device be built and operated to a sufficient degree so that the operation of the model satisfies all of the requirements of the claims.[3]  See *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986) (actual reduction to practice occurs only when the claimed invention is known to work for its intended purposes).  Here, this legal test was not met by the incomplete model built on May 12, 1982 by the inventors of the '584 patent because no rating code information was conveyed or "interleaved" within the closed captioning data stream and because the inventors did not even know how or where to place the rating codes.[4]

40.    In addition, Soundview and Mr. Elam also admit that the testing of the May 12, 1982 model did not utilize the "special set of characters" as required in claim 1 and col. 9, lines 15-19, wherein the special set of characters for the rating codes "must be chosen such that they do not correspond to any of the characters used for captioning or text."  For example, in Sharp Ex. 19, at SVW 1282, Mr. Elam wrote:

---

[3]  Alternatively, an invention can be "constructively" reduced to practice by the filing of a patent application covering the invention.  The Rule 131 declaration makes no reference to and does not rely upon the filing of its '584 patent application anywhere in the text of the document.  [Sharp Ex. 2, at TOS 166-189]

[4]  In somewhat analogous situations, the courts have uniformly held that the submission of only partial test data (which excluded unfavorable test data) to the USPTO constitutes grounds for inequitable conduct because the unfavorable test data also should have been submitted.  See, *e.g.*, *Rohm & Haas Co. v. Crystal Chemical Co.*, 722 F.2d 1556, 1572-73 (Fed. Cir. 1983).  *Cf. Bruno*

> "In these [May 1982] tests, the line 21 digital signals [for closed captioning] used to demonstrate operation did not actually represent the "movie rating" of the program material; the digital signal used were those of selected alphabet characters being currently transmitted on line 21."

41.    Therefore, the facts demonstrate that the model built and tested by the inventors on May 12, 1982 did not meet at least two of the elements of claim 1 of the '584 patent in suit.[5] First, the model did not convey or "interleave" any rating code information within the closed captioning data stream.

42.    Second, the May 12, 1982 model did not utilize the special set of characters for rating codes required by claim 1 because the model used alphabet characters normally used in closed captioning as opposed to special rating code characters "chosen such that they do not correspond to any of the characters used for captioning or text."

43.    Furthermore, as noted above, neither Mr. Elam nor Mr. Leavy are attorneys, let alone persons experienced in patent law.  [Sharp Ex. 9, at 266, 275-279, 297, 305, 327-328;

---

*Independent Living Aids Inc. v. Acorn Mobility Services Ltd.*, ___ F.3d ___, 73 USPQ2d 1593, 1596-98 (Fed. Cir. 2005).

[5]  Looking at it another way, Mr. Elam grudgingly admitted that prior to 1985 he lacked the chip set data information that he needed to actually prepare an engineering design.  Both this data and the engineering design are necessary to avoid the need for actual testing.  As Mr. Elam stated, "I mean if you have the [chip set] data you can do an engineering design and if you do an engineering design that's proper, you don't need to test.  It will work."  But Mr. Elam neither had the chip set data nor had he prepared the engineering design.  So he was at least two steps removed from a situation where no testing allegedly was necessary.  [Sharp Ex. 9, at 488-489] Had Soundview been acting in compliance with its duty of candor and good faith, it would have advised the USPTO in the Rule 131 declaration that it was at least two steps from a working model of the invention.  *LaBounty Manufacturing, Inc. v. U.S. International Trade Commission*,

Sharp Ex. 22, at 184-185]  Therefore, at a minimum, their lack of knowledge as to patent law should have been a "red flag" to the Soundview lawyers that they needed to explain the meaning of "reduction to practice" and they needed to investigate the structure and operation of the May 12, 1982 model.  In any event and as explained below, ignorance of the law is no defense and the inventors are charged with knowledge of the law.  *Brasseler, U.S.A.*, *supra*, 267 F.3d at 1385.

      **D.    Materiality Is Plainly Demonstrated Because the USPTO Withdrew the Objection Based Upon Chard And Accepted the Distinctions Argued By <u>Soundview as to the Other Prior Art</u>**

      44.    After receipt of the July 2, 1997 Response, the USPTO issued a Notice of Intent To Issue Reexamination Certificate dated January 26, 1998.  [Sharp Ex. 2, at TOS 299-301] This document proves the materiality to the USPTO of the statements by Soundview as to the scope of the claims, the distinctions argued by Soundview over the other prior art and the Rule 131 declaration with respect to the Chard patent.

      45.    As for the false Rule 131 declaration, the "materiality" of the declaration can not be more plainly recited in the 1998 Notice:

> "The Applicant's Declaration filed under Rule 131 was sufficient to overcome the effective international filing date 12/15/82 of Chard.  Therefore the rejection of claims 1-5 over Chard in view of admitted prior art and claims 1-3 over Keiser in view of admitted prior art is withdrawn."  [Sharp Ex. 2, at TOS 300]

---

958 F.2d 1066, 1076 (Fed.Cir. 1992) (where the issue of disclosure is close, the duty of candor and good faith requires disclosure).

908986

In other words, the false Rule 131 declaration resulted in the Chard reference being "withdrawn" as a reference.

46.    Similarly, the arguments of Soundview in the July 2, 1997 Response (which also submitted the Rule 131 declaration) as to the scope of claim 1 and the asserted distinctions over the other prior art were "material" to the allowance of the reexamination claims.[6]  In this connection, the 1998 Notice expressly states in finding patentability that:

> "The digital codes of a special set of characters are defined as ASCII digital codes transmitted in [closed captioning] line 21 of the vertical blanking interval sent serially with ASCII closed captioning character text information wherein the codes themselves are not recognized by the character detector as text information."  [Sharp Ex. 2, at TOS 300]

By this statement, the USPTO confirmed that it accepted Soundview's interpretation of the scope of claim 1 as requiring the rating code information to be conveyed within the closed captioning data stream, line 21.  In addition, the statement also accepts Soundview's arguments that the rating code information "must be chosen such that they do not correspond to any of the characters used for captioning or text."  See paragraph 13 above and Sharp Ex. 2, at TOS 300

47.    Based upon the foregoing facts and controlling law discussed below in paragraph 49 *et seq.*, the Court finds that the false statements in the Rule 131 declaration as to the erroneous dates of conception and reduction to practice were extremely material to the withdrawal of the

---

[6]  Prior to the submission of the July 2, 1997 Response, Soundview (via Mr. Schmidt) and its lawyers met with the Examiner handling the reexamination.  [Sharp Ex. 2, at TOS 165; Sharp Ex. 14, at 292-293]  As a result, the arguments in the 1997 Response were made in accordance

Chard patent reference and the allowance of the reexamination patent claims. The USPTO would have been very interested in knowing that the Rule 131 declaration dates of conception and reduction to practice are not accurate. Of course, it is not now possible to know what the USPTO would have done if it had been given the proper dates and information because that decision was taken out of the USPTO's hands by virtue of the false declaration. However, it is clear that Soundview and its representatives did not meet their duty of candor and good faith.

## IV.    **Legal Requirements Regarding Inequitable Conduct**

48.    A determination with respect to the issue of inequitable conduct involves a weighing of both materiality and intent. Where there is a very high level of materiality, one need only establish a very low level of intent to establish inequitable conduct. See, *e.g., Li Second Family*, *supra*, 231 F.3d at 1378. In addition, inequitable conduct includes situations involving "affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Perspective Biosystems, Inc. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1318 (Fed. Cir. 2000).

49.    As noted above, the materiality of the false statements in the Rule 131 declaration are extremely high. Indeed, representations of fact in a declaration or affidavit to a patent examiner are inherently material.[7] *Refac International*, *supra*, 81 F.3d 1576, 1583; *General*

---

with the Examiner's Interview Summary requirement that Soundview "define 'special codes' in claim 1 to define over Keiser."

[7]    There is no legal basis to support Soundview's position that a finding of materiality can be dismissed based upon facts or arguments that were not expressly presented to the USPTO. Such

908986

*Electro Music Corp.*, *supra*, 19 F.3d at 1411; *Rohm & Haas Co., supra*, 722 F.2d at 1571 ("In contrast to cases where allegations of fraud are based on the withholding of prior art, there is no room to argue that submission of false affidavits is not material.").

50.     Based upon the facts of this case, a very high level of materiality has been established with respect to the false statements in the Rule 131 declaration.  Thus, only a very low level of intent needs to be shown to establish inequitable conduct.

51.     As for intent, the facts of this case establish that Soundview and its representatives were more than merely grossly negligent with respect to the false statements in the Rule 131 declaration.  Where as here, if there is a reason to doubt the accuracy of information or the adequacy of the client's understanding, then the attorney must conduct a reasonable investigation into the matter.  *Brasseler, U.S.A.*, *supra*, 267 F.3d at 1382-1383.  In addition, as the Federal Circuit stated in *Critikon, supra*, 120 F.3d at 1257:

> "No single factor or combination of factors can be said always to require an inference of intent to mislead; yet a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an intent to mislead.  A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice under the circumstances."

---

a legal standard plainly conflicts with the duty of candor and good faith imposed by the USPTO and would encourage applicants to play "fast and loose" with the facts so long as they can later argue some other basis to support their position.

908986

In summary, conduct beyond mere gross negligence will support a finding of inequitable conduct.

52.     In the present case, there were numerous "red flags" in the record that an attorney should have seen which would have lead to a detailed investigation.  First, the terms "date of conception" and "reduction to practice" have specialized meanings in patent law.  Thus, knowing that the inventors are not lawyers or experienced in patent law, the Soundview attorneys (at the very least) should have explained the meaning of these terms to the inventors to ensure that the terms were being properly used by the inventors in the Rule 131 declaration and the attorneys should not have merely accepted the Disclosure and Record of Invention document with blind faith.  As shown by Mr. Elam's deposition, when presented with a proper definition for the date of conception, he candidly admitted that the date on that document was not accurate.[8]  [Sharp Ex. 9, at 218-220; see also Mr. Leavy's deposition where he admitted that the date of conception was prior to when he did any work with Mr. Elam, Sharp Ex. 22, at 138-139]

53.     In any event and as is the case with every other area of the law, knowledge of the law is chargeable to the inventor and ignorance of the law is no defense.  *Brasseler, U.S.A.*, *supra*, 267 F.3d at 1385.  Otherwise, a patent applicant's duty of candor and good faith would be meaningless because of the easy excuse provided by an applicant stating that he/she did not

---

[8]   Although no attorneys explained the meanings of "date of conception" or "reduction to practice" to Mr. Elam with respect to the Rule 131 declaration, it is noteworthy that lawyers did explain those meanings to Mr. Schmidt in connection with another patent application.  [Sharp

know what the law required or what patent terms mean.  To the contrary, the USPTO must be able to rely upon the factual and legal statements in an inventor's declaration.  Thus, here, this duty of candor and good faith was not met because no one explained the legal meanings of "date of conception" and "reduction to practice" to the inventors who signed the Rule 131 declaration.  Because the inventor is charged with knowledge of the law, his subsequent admission that one or more factual statements in a declaration are wrong serves to satisfy the intent requirements of inequitable conduct.

54.     Second, a clear "red flag" arose from even a cursory reading of the date of first disclosure to others in the Disclosure and Record of Invention document.  Because this first disclosure was more than one year prior to the filing date of the application, any competent attorney would have recognized a potential bar to patentability under 35 U.S.C. §102 (b).  [Sharp Ex. 12, at 71-72]

55.     Third, because the Disclosure and Record of Invention document uses the language "Date First Construction Of Model Was Made" as opposed to the patent legal language "date of reduction to practice," Soundview's attorneys should have closely questioned the inventors with respect to the actual structure and operation of the May 12, 1982 model.  If they had done so, they would have received the same answers that Mr. Elam candidly gave during his 2001 deposition wherein he admitted that (a) the rating code information was not conveyed or

_____

Ex. 14, at 45-47]  This evidence supports the existence of a duty to explain patent terminology when it is relevant to issues raised in a patent application.

"interleaved" within the closed captioning data stream in May 1982 and (b) the May 12, 1982 model and testing did not satisfy the claim requirement that the rating code information "must be chosen such that they do not correspond to any of the characters used for captioning or text." [See paragraphs 37-42 above]

56.     The duty of the Soundview attorneys to ask these questions and the "red flags" were obvious because these very same arguments were emphasized in the July 2, 1997 Response in order to define the scope of claim 1 of the '584 patent and to distinguish the other cited prior art.

57.     The duty to ask these types of questions was admitted by one of Soundview's many attorneys who worked on the reexamination application relating to the '584 patent. Specifically, the senior attorney in charge of the reexamination application filing [Sharp Ex. 13, at 12, 18; Sharp Ex. 14, at 236, 254] admitted as follows:

> Q.     Bearing in mind the arguments made by Mr. Lesht in his [July 2, 1997] response to the Office Action that was submitted on behalf of Soundview, that the prior art does not teach how to incorporate program ratings into closed captioning – the closed captioning stream, am I correct that there could have been no actual reduction to practice by the inventors, if the first time they actually – … if this year [2001] is the first time when the inventors actually were able to perform that interleaving?
> A.     Well, subject to those objections, I wouldn't answer that question unless I had done a – proper research and legal research and learned the proper facts, and it would be, I think, irresponsible for me to answer what I consider to be a – a question of detailed patent law without doing proper preparation.
> Q.     And, therefore, if you had been preparing a Rule 131 declaration, you would have conducted that research, both factual and legal, prior to submitting the Rule 131 declaration?
> A.     Again, I don't know, because I don't know what I would have done.  I

don't know what the facts would have been and I – but in answer to your previous question, today, in November of 2001, to fully answer this question would require, today, my performing factual and legal research."   [Sharp Ex. 13, at 80-81]

58.     As noted previously, an officer of Soundview (Mr. Schmidt) attended the Interview with the Examiner and participated in the review of the July 2, 1997 submissions by Soundview.  [Sharp Ex. 2, at TOS 165; Sharp Ex. 17]  Significantly, Mr. Schmidt also worked very closely with Mr. Elam during the 1990's so that it is inconceivable that Mr. Schmidt did not know that, prior to the filing of the July 2, 1997 Response, Mr. Elam had never been able to convey or interleave rating code information within the closed captioning data stream and, therefore, he was unable to detect any rating codes interleaved with closed captioning data. [Sharp Ex. 9, atb 399-400; Sharp Ex. 14, at 66, 204-210, 215, 224-225, 292-293]

59.     Further, Soundview also had in its possession a 1983 FCC letter, which proved that no interleaving was performed in 1982.  [Sharp Ex. 19, at SVW 1282]  This information was not provided to the USPTO and it is not referenced in the Rule 131 declaration.  See *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1191 (Fed. Cir. 1993) (the intent to mislead arises "not simply from the materiality of the affidavits, but from the affirmative acts of submitting them, their misleading character, and the inability of the examiner to investigate the facts").

60.     Intent does not require direct "smoking gun" evidence.  *Bristol-Meyers Squibb Co. v. Ben Venue Labs.*, 90 F. Supp.2d 522, 526 (D. N.J. 2000).  Rather, this element may be

908986

inferred from the applicant's overall conduct. *Baxter Int'l., Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1330 (Fed.Cir. 1998) ("intent is generally inferred from the sum total of the applicant's conduct"); *LaBounty Manufacturing, Inc. v. U.S. International Trade Commission*, 958 F.2d 1066, 1076 (Fed.Cir. 1992) ("a patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead" citing *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1416 (Fed. Cir. 1987); *Elk Corporation of Dallas v. GAF Building Materials Corp.*, 168 F.3d 28, 32 (Fed.Cir. 1999) *cert. denied*, 120 S.Ct. 178 (1999). Further, deceptive intent may be inferred when an applicant withholds material information and makes arguments for patentability which could not have been made had the information been disclosed. *LaBounty Manufacturing*, *supra*, 958 F.2d at 1076.

61.     Under the totality of these circumstances, sufficient culpability has been established beyond gross negligence on the part of Soundview (via its Mr. Schmidt), its attorneys and the inventor so that an intent to deceive is established.[9] See *Brasseler, U.S.A.*, *supra*, 267 F.3d at 1383 (one should not be able to cultivate ignorance or disregard warnings and, therefore, court affirms finding of inequitable conduct); *LaBounty Mfg., supra,* 958 F.3d at 1076 (where the

---

[9]  As noted in paragraph 33 above, Soundview has relied upon an attorney opinion letter to support the May 12, 1982 reduction to practice date. However, when that attorney's deposition was taken, Soundview's attorney invoked attorney client privilege and instructed the witness not to answer with respect to any investigation work done to confirm the reduction to practice date that formed the factual basis for the opinion letter. [Sharp Ex. 12, at 60-62, 64, 65-66, 67-69, 76-78, 87-93, 127-129, 133-135]

issue of disclosure is close, the duty of candor and good faith requires disclosure).  Further, because Mr. Elam was a member of Soundview's Board of Directors while the reexamination proceeding was pending, his personal knowledge of the facts showing no reduction to practice must be imputed to Soundview.  [Sharp Ex. 9, at 358]  *Cf.*, *FMC Corp. v. Manitowoc Co., Inc.*, 835 F.1411, 1415 n. 8 (Fed. Cir. 1987).

62.    It is well settled law that inequitable conduct with respect to any one claim in a patent renders the entire patent unenforceable.  *Baxter Intn., Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1332 (Fed. Cir. 1998).  Therefore, because at least claims 1-5 were inequitably procured by the withdrawal of the Chard rejection in view of the false Rule 131 declaration, the entire '584 patent is unenforceable so that no claim under that patent could have been asserted properly against Sharp.

## V.    Sharp Is Entitled to the Award of Its Attorneys Fees

63.    Sharp has submitted evidence that it received invoices for services and disbursements from its litigation counsel in an amount of about $2 million in connection with its defense of this case.  The evidence further proves that these invoices were paid by Sharp.  [Sharp Ex.20]

64.    Sharp also submitted the AIPLA Report of the Economic Survey 2003 to establish that its counsel's hourly rates were reasonable.  The Report further demonstrates that the median cost for patent infringement litigation (where between $1 million and $25 million is at risk) is about $2.5 million through the end of discovery, inclusive of costs.

65.     Under the circumstances presented above and bearing in mind various other factors relating to the litigation of this case, the Court finds that Sharp is entitled to an award of its reasonable attorneys fees and expenses in the amount of $2,000,000.00.  Some of the other factors that influence this award are (1) the fact that Soundview has received over $24 million is royalties under the '584 patent, (2) the fact that Sharp and the other non-Soundview parties prevailed on summary judgment with respect to the issue of no infringement of the '584 patent, (3) the fact that Sharp and the other non-Soundview parties prevailed on summary judgment with respect to the antitrust and CUPTA claims made by Soundview, and (4) the facts set forth in the previously submitted motion by all of the non-Soundview parties for attorneys fees based upon bad faith litigation.

ON BEHALF OF SHARP


By: _____
William M. Bloss,
Federal Bar No. ct01008
Koskoff Koskoff & Bieder, P.C.
350 Fairfield Avenue
Bridgeport, CT 06604
Tel:  (203) 336-4421
FAX:  (203) 368-3244


By:_____
Robert W. Adams
Updeep S. Gill
NIXON & VANDERHYE PC
1100 North Glebe Road. 8th Flr.
Arlington, VA 22201
(703) 816-4000

908986

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been mailed, postage prepaid, on this

28th day of February, 2005 to all counsel of record for the parties, as follows:

Jacqueline D. Bucar, Esq.
Tyler Cooper & Alcorn
205 Church Street
P.O. Box 1936
New Haven, CT  06509-1910

Brian E. Moran, Esq.
Joseph L. Clasen, Esq.
Robison & Cole, LLP
695 East Main Street
P.O. Box 10305
Stamford, CT  06904-2305

Raymond Niro, Esq.
Robert P. Greenspoon, Esq.
Niro Scavone Haller & Niro
181 West Madison Street, Suite 4600
Chicago, Illinois  60602

John J. Bogdanski, Esq.
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT  06114

Peter J. Kadzik, Esq.
Dickstein Shapiro Morin & Oshinsky
3101 L Street NW
Washington, DC  20037

Larry S. Nixon, Esq.
Nixon & Vanderhye P.C.
1100 North Glebe Road, 8th Floor
Arlington, Virginia  22201-4714

908986

Vincent J. Belusko, Esq.
Morrison & Foerster
555 West Fifth Street
Suite 3500
Los Angeles, California  90013-1024

Richard Gresalfi, Esq.
Richard I. Delucia, Esq.
Elizabeth Gardner, Esq.
Kenyon & Kenyon LLP
One Broadway
New York, New York  10004

_____
William M. Bloss

908986