<

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SONY ELECTRONICS, INC. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | LEAD DOCKET NO. |
| | ) | 3:00-CV-00754 (JBA) |
| | ) | U.S.D.C./New Haven |
| SOUNDVIEW TECHNOLOGIES, INC. et al., | ) | |
| | ) | ALL CASES |
| Defendants. | ) | |

**SOUNDVIEW'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW ON SHARP'S ALLEGED INEQUITABLE CONDUCT DEFENSE**

Raymond P. Niro (ct18107)
Robert P. Greenspoon (ct21736)
NIRO, SCAVONE, HALLER AND NIRO
181 West Madison Street, Suite 4600
Chicago, Illinois  60602
Phone: (312) 236-0733

John J. Bogdanski (ct06217)
David S. Monastersky (ct13319)
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, Connecticut 06114
(860) 249-1361
Fax: (860) 522-9549

Attorneys for Soundview Technologies, Inc.

Soundview Technologies, Inc. ("Soundview") hereby provides its proposed findings of fact and conclusions of law.  These proposals rely on Sharp's February 25, 2005 letter withdrawing all theories of inequitable conduct other than those based upon an allegedly false Rule 131 affidavit and allegedly deceitful withholding of Carl Elam's Resolution and Petition.

## PROPOSED FINDINGS OF FACT

### The Beginning Of The V-Chip Idea

1.     In May 1981, before the '584 patent's invention, Captain Carl Elam (a radar countermeasures officer with the Air Force, stationed in Ohio, and a father of two young children) was concerned that there was a lot of television programming inappropriate for children.

2.     He was also aware of the need to avoid censorship and governmental restrictions on programming content.

3.     A member of the Baptist church, he asked his pastor, the Rev. Walter R. Davis, to bring a Resolution on this subject to the attention of the relevant subcommittee of that year's Baptist Convention. Captain Elam drafted the Resolution and provided it to his pastor.

4.     The Resolution is a non-technical document. It recites certain goals for parental control over television programming, but gives no hint how such goals can be achieved in a working device.

5.     Elam has no firsthand knowledge of whether the pre-invention Resolution was actually presented at the 1981 Baptist Convention, but he assumes that a copy of it still exists in the Baptist Convention archives.

1

6.    There is no way for an interested member of the public to learn the Resolution is archived with the Baptist Church; for example, there is no card catalog or index available to the general public indicating its existence.

7.    The Resolution is not a "printed publication."

8.    Around May of 1981, and still before the '584 patent's invention, Captain Elam attempted to interest the Federal Communications Commission in the problem of objectionable television programming.  He wrote a short transmittal letter (calling it a "Petition"), and provided it to the FCC with a copy of the Resolution.

9.    The FCC never acted on the Petition.  Since the Petition never went to a review and comment period, it, too (like the Resolution) was not a "printed publication."

10.    The Petition suggests a different implementation from that which ultimately became the '584 patented invention.  Namely, the Petition suggests it would be <u>inappropriate</u> to put a digital rating code in a line of a television broadcast that already includes digital data, stating: "There should be no effect of the proposed changes upon the operation of current model television receivers provided the digital code is not placed on line 19 or any other line currently used to convey data to television broadcast receivers used by the general public."

11.    Neither the Resolution nor the Petition disclose the invention as later claimed in the '584 patent.  Neither document mentions closed captioning, whereas the claimed invention <u>requires</u> the use of a closed captioning circuit.

12.    As of early 1981, Captain Elam had in fact not yet become aware of closed captioning.

2

13.     Neither the Resolution nor the Petition contains sufficient information in its four corners to enable one of ordinary skill in the art to make the invention without undue experimentation.

14.     At the time the Resolution and Petition were drafted, Captain Elam had not yet worked on any circuitry that might meet the goals he had for parental control and had not yet asked for co-inventor Leavy's assistance.  Indeed, it took Captain Elam and Lieutenant Leavy nearly a year more themselves (well into 1982) to come up with the invention. Captain Elam could not have completed it without Lieutenant Leavy's help.

15.     The Resolution and the Petition disclose no more technical information than did the prior art of record during prosecution, including at least the Keiser patent.

**Elam and Leavy Team Up**

16.     By the Fall of 1981, Lieutenant Leavy volunteered to help Captain Elam implement a working parental control device for television. Lieutenant Leavy had expertise in digital logic, which Captain Elam did not possess. Together they progressed through a number of potential circuit designs.

17.     Whereas Captain Elam was by then leaning away from using digital logic to achieve parental control features, Lieutenant Leavy convinced him to stay with a digital implementation. Meanwhile, in late 1981 or early 1982, Captain Elam learned of closed captioning.  He now recognized the advantage of broadcasters placing a digital rating code in the same data stream as closed captioning (directly against his initial thinking shown in the Petition).

18.     In February 1982, Captain Elam purchased an off-the-shelf commercial set-top-box closed captioning decoder for study. Working with this set-top-box gained him the confidence to know that a full-scale television prototype was feasible.

19.     On April 22, 1982, Captain Elam purchased a complete Sears/Sanyo television set, with an incorporated closed captioning decoder.

20.     By May 12, 1982, Captain Elam and Lieutenant Leavy had completed the final design of their circuit. By that date, they had incorporated additional program rating decoder and blanking circuitry into the Sears/Sanyo television set, and had sufficiently tested the operability of the device. Captain Elam perceived that it clearly appeared to work properly. He had no doubt that it was actually working. Once completed and tested on May 12, 1982, nothing about the prototype circuitry changed thereafter. The prototype circuitry formed the basis in all particulars for the detailed description in the '584 patent application, which was filed in July 1983.

### How The May 12, 1982 Prototype Worked

21.     The prototype television (completed and tested by May 12, 1982) was designed to "listen" for a particular two-byte rating code within the closed captioning stream of a television broadcast.

22.     The rating code of the prototype consisted of two characters: a first character (known as a "DC-6" which had the digital value of "0010110") and a second character (which had any of six different digital values, depending on what "rating character" the rating code as a whole was supposed to signify).

4

23. The first character (DC-6) was not, as of 1982, in general use in closed captioning (it was considered an "invalid control code"). The Telecaption Training Manual of that time period states, on p.7, "Reception of any invalid control code will cause the system to ignore all subsequent character transmissions until receiving a valid control preamble." It also indicated DC-6 was not among valid control codes.

24. The second character, in contrast, used bytes that closed captioning already used to represent alphanumerics (e.g.,"T, Y, A, Q, W and X" for ratings corresponding to Gv, PGv, Rv, Ga, PGa, Ra, respectively). For example, if a hypothetical television broadcast was "rated PG" for video, the prototype television would "hear" these two digital bytes: "0010110" (the DC-6 code) and "1011001" (the alphanumeric "Y" code), and would know that the current television program was rated PG. In that case, if the television viewer only wanted to watch shows rated G, receipt of the PG rating code would cause the circuitry to blank the video.

25. The co-inventors deliberately did *not* merely use the bytes corresponding to a rating's actual letters. For example, they did *not* use the byte for "P" followed by the byte for "G" to signify "rated PG," and for good reason. If they had, the letters "P" and "G" would have interfered with closed captioning by becoming part of a row of displayed caption text. Instead, they used the otherwise-unused "DC-6" code ("0010110") as the first of the two rating code character bytes. DC-6 did not itself signify an alphanumeric letter or number, and *because of its occurrence as the first character*, the second character would not be displayed on the screen as an alphanumeric in closed captioning.

## How the Co-Inventors Tested By Simulating a DC-6 Code

26.     Since the co-inventors were not television broadcasters themselves, and did not have the resources to rent a television studio, their testing had to simulate the receipt of a rating code.  At that point in time, Captain Elam had no way of generating a DC-6 code.  So he could not test the prototype set with the DC-6 enable operational.

27.     The way Elam and Leavy simulated rating codes was, in effect, to electrically bypass the need for the initial DC-6 byte.  Again, DC-6 codes were not at the time a regular part of the closed captioning protocol.

28.     While in a testing/diagnostic mode, the prototype television only needed to receive the second byte of a valid rating code to believe it had "heard" a rating within the broadcast.  Their prototype had a testing/diagnostic mode, whereby enable line 2 was activated every time there was a captioning line 21 field one present.

29.     Put another way, during the testing mode, if a "Y" appeared in a closed captioning text word (e.g., if the closed captioning were to display the word "Tuesday"), the television would "think" it heard a code corresponding to a video rating of PG.  This ingenious method meant that a regular, unaltered closed captioning data stream (which was already being normally broadcast) would make the television believe that rating codes were in fact on the signal.  The co-inventors could thus test their invention to determine whether it worked without altering a broadcast signal in any way.  That was a way of activating the system in the absence of having a DC-6 code being transmitted.

30.     Blanking occurred as expected in the testing mode. The circuitry all worked. This testing successfully established, as of May 12, 1982, that the invention worked for its intended purpose.

6

31.    Since the invention used logic circuits (which have entirely predictable behavior), there was no question in light of the successful testing mode results that the invention would have functioned as designed had a broadcaster actually sent out a full rating code recognizable to the prototype, i.e., first character: DC-6, second character: alphanumeric.

### Attempts to Fill Out the Air Force Invention Disclosure Form

32.    By July 30, 1982, with the completion of their Disclosure and Record of Invention form, the co-inventors began the process of getting the Air Force's approval to seek a patent. On the form, the co-inventors had filled in several boxes without any guidance. They were not given any instructions.

33.    One of these boxes on the form (box 8) asked for the date of conception. Since no patent claim yet existed, Captain Elam had to rely on his layperson's understanding that when the form asked for "Date Invention Was Conceived," it was asking for something less precise: "the earliest date you thought of the subject." Understandably, and in good faith, Captain Elam entered May 25, 1981 in this box (the date of the Resolution), although with the benefit of hindsight and knowing the content of the actual issued patent claim, his true "date of conception" cannot have occurred before the Spring of 1982. Until his deposition in this case, Captain Elam had no awreness that the entry in box 8 needed to be revised.

34.    Captain Elam's *other* entry on the form of May 12, 1982 for the building and testing of the device is correct. Box 9 was for "DATE FIRST CONSTRUCTION OR MODEL WAS MADE". That was the date known as the "reduction to practice" of the invention.

7

35.    The law recognizes that a "date of invention" factors in two events: conception and reduction to practice. 35 U.S.C. § 102(g).  A "date of invention" is never later than the date of "reduction to practice," although it may be earlier if there is an earlier "date of conception."

36.    Since the prototype built and tested by May 12, 1982 forms the technical basis for all of the patent claims that ultimately issued in the '584 patent, May 12, 1982 is the latest possible "date of invention" for all claims.

### Issuance of the Patent

37.    The Air Force acknowledged receipt of the Disclosure and Record of Invention, and indicated it was evaluating it, on September 21, 1982.

38.    The co-inventors signed their oath and declaration in connection with the patent application on June 9 (Leavy) and June 21 (Elam), 1983.

39.    The application was filed July 8, 1983.

40.    U.S. Patent No. 4,554,584 patent issued November 19, 1985.

### Soundview Buys the Patent and Lets the Patent Office Look Again at Validity

41.    In the mid-1990's, Soundview purchased the '584 patent from Elam and Leavy. Soundview intended at the time to manufacture a commercial device that would comply with the then-developing v-chip standards.  Soundview believed the '584 patent created intellectual property protection for its contemplated product.  Soundview also intended to license the '584 patent as necessary to the entire television industry on a nondiscriminatory basis to whoever needed a license.

42.     Soundview's Dave Schmidt became aware of potential prior art to the '584 patent that had not been cited before.  Soundview decided to submit the '584 patent to the Patent Office to be reexamined on this art.

43.     Soundview hired the Washington, DC law firm of Finnigan Henderson to file and prosecution the reexamination.  It was filed on August 1, 1996.  Bob Yoches, Esq., was the primary responsible attorney.  Doris Hines, Esq. also worked on the matter.  Soundview retained Finnigan Henderson on an hourly-fee basis.

44.     During reexamination, the fact of the May 12, 1982 "date of invention" became relevant.  On April 30, 1997, the Patent Office rejected pending claims 1-5 over a combination of the Chard patent and other prior art..  Since Chard's effective prior art date is June 23, 1983, it was possible to "swear behind" Chard, or antedate it, by proving an earlier date of invention.

45.     Before setting out on that course of conduct, Soundview obtained the written legal advice of one of their attorneys, Doris Hines, Esq. of the Finnegan Henderson firm, as to whether it was possible to "swear behind" Chard. She concluded that it was.  Soundview acted in reliance on that advice.

**Soundview Submits the Inventors' Declaration to Antedate the Chard Patent**

46.     Soundview submitted the co-inventors' Rule 131 Declaration, which attested to the earlier date of invention and attached the Air Force documents for corroborating support.  Given that the May 12, 1982 date of reduction to practice is the latest possible date of invention for all claims in the '584 patent, and since this date is clearly earlier than Chard, the '584 patent's "date of conception" is non-relevant.  That is, even if the official "date of

9

conception" were the latest one theoretically possible, that is, the same date as the "date of reduction to practice" (May 12, 1982), it is still earlier than Chard. No reasonable examiner would have cared what the true legal date of conception was once the patentee established a date of reduction to practice that is earlier than the prior art reference's effective date.

47.    When reduction to practice pre-dates a reference, conception is simply irrelevant, and non-material.

48.    Also during reexamination, Soundview described why in one respect, the claimed invention differed from certain prior art. Namely, Soundview pointed out that the prior art (particularly the Keiser patent) lacked any teaching of how to have a rating code that could be sent in the closed captioning data stream without "interfering" with the closed captioning data stream.

49.    The Special Master concluded that Soundview's comments on this point are a "fair and reasonable" interpretation of what the '584 patent specification teaches and what the claims cover. Namely, Special Master Peterson has agreed with Soundview that these comments refer to the feature of the invention whereby the <u>content</u> of the rating code ensures that the appearance of the rating code creates no unwanted letter or number in a textual caption. The way this was done in the prototype (and identically in the patent's own detailed description) was to use the DC-6 code, which was known in the art to prevent the next byte (i.e., the second character) from forming on the television screen a caption letter or number.

## The Resolution and Petition are Not Prior Art

50.    The Resolution and the Petition are not prior art. Both the Resolution and the Petition lack any substantial technical detail that would permit one of ordinary skill in the art

to construct a device according to their teachings without undue experimentation. They are non-enabling.

51.     The Resolution and the Petition are not prior art. The Resolution and Petition were not available to interested members of the public, and are not "printed publications." Without learning the information from Elam himself, no person interested in the content blocking or television arts would even be able to learn of the existence of these two documents.

52.     Nothing in either the Resolution or the Petition contradicts any position Soundview took during reexamination.

53.     The Resolution and the Petition are not "material." All of the parental control goals recited in the Resolution are likewise recited in the Keiser patent, which was considered by the Examiner. That makes the Resolution "cumulative," and thus not subject to a duty of disclosure. The little extra detail contained in the Petition teaches away from what the co-inventors actually invented, since it suggests <u>not</u> to place rating codes on the same television line that already contains digital data. If anything, disclosing the Petition to the Patent Office would have been <u>in favor of</u> patentability.

54.     No one involved in prosecution of the '584 patent or its reexamination certificate ever believed or even suspected that the Resolution or the Petition was "material prior art."

55.     David Schmidt and Soundview never believed the Resolution met the legal definition of material prior art.

56.     As for the Petition, no one at Soundview even knew it existed; of all persons charged with a duty of candor in connection with the '584 patent, only Carl Elam knew about

11

the Petition during the relevant time periods.  He did not believe the Petition was a "publication."

57.    No one made a deliberate decision to withhold a **known material** reference in connection with the Resolution and Petition.  Soundview's non-submission of those documents to the Patent Office is not the product of an intent to deceive the Patent Office.

### Soundview Consistently and Truthfully Explained "Non-Interference"

58.    In the reexamination remarks, Soundview never sought to distinguish the invention from Keiser and other prior art on the grounds alleged by certain non-Soundview parties (i.e., "where" and "how" to insert rating codes within a closed captioning data stream). A simple review of Soundview's patent claims reveals why. The claims, including independent claim 1, never deal with or imply any particular <u>place</u> in a data stream to insert rating characters.  That is a level of implementation detail beyond the scope of the patent claims. The patent is indifferent to those implementation details and assumes an implementing technician will do it correctly.

59.    Soundview's remarks truthfully explained the <u>content</u> of the '584 rating codes prevents their "interfering" display, not the <u>place</u> where they are inserted into a data stream. For example, the rating codes of the preferred embodiment do not interfere with closed captioning display.  The rating codes shown in Table I of the patent have a first character (i.e., the DC-6) that, because of its particular digital content, is not recognized in the closed captioning decoder as captioning or text.  The rating code then has a second character that, *because of the occurrence of the first character*, is not displayed as captioning or text. This second character may or may not be otherwise alphanumeric.  Again, Soundview never

argued during reexamination that the <u>place</u> for inserting rating codes had any significance to the claimed invention; only the <u>content</u> of the rating codes themselves, which if selected in accordance with the preferred embodiment caused no false display, and hence did not "interfere" with the closed captioning data stream.

60.    In the reexamination office action response, Soundview explained the invention as follows:

> The special set of characters called for in the claim are characters which will not be displayed as ASCII alpha-numeric characters, and therefore 1) do not interfere with the data stream, and 2) can be readily separated from the data stream.  This special set of characters are defined in the patent specification.

> * * *

> ... It should be noted that in each case the first byte is a non-printing non-ASCII alphanumeric byte which has as its purpose to designate that the second byte, which may or may not be ASCII alphanumeric, will contain rating information.

> * * *

> At col. 9 lines 15-19 the specification requires that the rating codes not correspond to any of the characters used for captioning or text.

>> "Note that the captioning or text feature of the TV receiver can be used at the same time as the auxiliary rating circuit.  The rating codes must be chosen such that they do not correspond to any of the characters used for captioning or text." (Col. 9 lines 15-19).

> * * *

> Since applicants' system does not interfere with the Closed Captioning data stream the program rating feature is achieved without any effect on other features of the receiver.

13

The foregoing excerpt is correct in its characterization of the invention.

61.     Soundview was explicit in what it meant by the term "interfering" with closed captioning: "The special set of characters called for in the claim are characters which **will not be displayed** as ASCII alpha-numeric characters, and **_therefore_** 1) **do not interfere** with the data stream ...." Non-interference means non-display.  And non-display occurs because of a '584 patent rating code's <u>content</u>, not its <u>place</u> in the data stream.  Nor did Soundview argue its case any other way.

62.     There was no falsehood given the Examiner.  Soundview never suggested to the Patent Office the inventors had located a "place" in the data stream for a rating code. There was no "intent to deceive."

63.     The Special Master analyzed the exact reexamination office action response and concluded, "Contrary to the Non-Soundview Parties' argument, the discussion in that response of what the specification teaches **is both a fair and reasonable interpretation**. On balance, in fact, **Soundview's interpretation of the specification is measurably more reasonable than the Non-Soundview Parties' interpretation**."

## The Rule 131 Declaration Was Truthful

64.     By May 12, 1982, the co-inventors had built and tested the exact prototype of the invention described and claimed in the '584 patent.  As of that date, the co-inventors had no doubt that they had perfected a working, operable device that functioned according to its intended purpose.  Soundview's Rule 131 Declaration submitted during reexamination set forth the truthful facts establishing a date of invention earlier than Chard's effective date (June 1983).

14

65.     In respects relevant here, the Declaration states as follows:

We, Carl M. Elam of Perry Hall, Maryland, and Dale A. Leavy, of Orlando, Florida, do hereby depose and say as follows:

1.     That we are co-inventors of the invention disclosed and claimed in the above-identified patent under reexamination proceeding.

2.     That it is our understanding that United States Letters patent No. 4,605,964, which issued to Frederick W. Chard on August 12, 1986, and which bears a PCT Publication Date of June 23, 1983, has been cited by the USPTO ....

3.     That the invention disclosed and recited in the claims of our patent, U.S. Patent No. 4,554,584, was made prior to June 23, 1983 ....

4.     That our invention was made and completed in the United States of America and actually reduced to practice prior to June 23, 1983, or was conceived prior to June 23, 1983 coupled with due diligence from prior to June 23, 1983 to a reduction to practice subsequent thereto, as evidence by the attached exhibits.

5.     That Exhibit A is a copy of the Disclosure and Record of Invention AF Form 1279 completed by us and returned to the United States Air Force prior to June 23, 1983.   Said Form includes a complete description of our invention, such description being dated prior to June 23, 1983.  Said form further reports on the date of conception, date of first disclosure to others, date of first drawing or sketch, date of first written disclosure, and date a first construction or model was made – all of said dates being prior to June 23, 1983.

All of the foregoing recitations (and all of the rest not specifically quoted) are absolutely true.

66.     Elam and Leavy did not actually place a DC-6 code into a closed captioning data stream; rather, they teased their prototype into believing that a DC-6/alphanumeric rating code had been received by bypassing in the circuitry the need for the initial DC-6 byte.  Thus they simulated receipt of a two byte rating code, in a manner that still tested whether the television would blank when specific predetermined digital data appeared in the closed captioning data stream.  Their invention worked.  Given their use of digital logic, they had no doubt that their prototype also would work in the context of the actual broadcast of a full DC-

15

6/alphanumeric rating code, as described in the patent. The May 12, 1982 testing was more than sufficient to permit Elam and Leavy to conclude that their invention worked for its intended purpose. With such knowledge, the inventors "reduced to practice" their invention by that date.

67.     The only feature of the prototype television that had to be simulated was receipt of a broadcast transmission of a specific two byte rating code. That feature was simulated in a manner that left no doubt that the prototype would function as designed in conditions of actual use. Had a DC-6/alphanumeric code recognizable to the prototype actually been sent on May 12, 1982, the inflexible principles of digital logic (combined with the inflexible functional specifications of then-extant closed captioning decoders) necessarily dictate what would have happened. The receiver would have blanked as appropriate, and the DC-6/alphanumeric rating code would have not interfered with closed captioning by causing a false textual display in the screen caption.

**Elam's Identification of a Design Trade-Off Does Not Make the Declaration False**

68.     In 1984 or 1985, Carl Elam identified a design trade-off caused by using his claimed invention that would be useful to address prior to commercial implementation. He determined that use of his invention, while not "interfering" with closed captioning in the sense of placing unwanted text on the display, might degrade the performance of closed captioning by "putting to sleep" the rest of a text row.

69.     Elam's identification of this design trade-off does not retroactively refute his reduction to practice in May 1982. Keeping closed captioning "awake" is not a claim limitation, nor was it a goal or purpose of Captain Elam's video/audio blanking work in 1982.

16

The '584 patent involves a circuit in a television receiver, not video mixer interleaving techniques. Preventing the remaining text in a closed captioning row from disappearing may or may not be desirable in any commercial implementation of the '584 patent, but it is not required by or excluded from the claimed invention.

70.     The Special Master's interpretation of "special set of characters" in the '584 patent does not require or preclude keeping a row of closed captioning "awake." It is directed to the converse, preventing a successfully transmitted rating code from appearing as a false text display. The May 12, 1982 tests confirmed the prototype achieved this intended purpose.

71.     Captain Elam believed it was up to the FCC to make decisions about proper rating code placement, and the '584 patent states that this job would be done by video mixers at television networks and local television stations.

### Soundview Acted in Good Faith, Not With Intent to Deceive

72.     Soundview's non-submission of the Resolution was justified: it was not prior art, and Soundview did not believe it was. Soundview acted in good faith, not deceptively.

73.     Soundview's non-submission of the Petition was justified: it was not prior art, and Soundview did not believe it was. Carl Elam was the only one who knew of its existence. Soundview acted in good faith, not deceptively.

74.     Soundview did not intend to deceive the Patent Office in connection with the Rule 131 Declaration, nor did it have any reason to do so. The undisputed facts accurately pointed to an invention date before the effective prior art date of Chard.

75.     Elam and Leavy's date entry for "conception" had no bearing on the pertinent question from the Patent Office's point of view: whether the co-inventors' invention date (which

at the latest was the date of reduction to practice) predated the effective date of Chard. There is no evidence suggesting Soundview had anything to gain by arguing to the Examiner a date of conception in 1981 rather than 1982. Either way, Soundview predates Chard.

76.     Elam and Leavy were not deceptive in 1982 when they made the 1981 entry on the Air Force form. The "date of conception" intended by the entry in the Air Force invention disclosure form was the co-inventors' lay person's understanding of the "date of conception" of the broadest goals of the invention. As such, the 1981 "conception" entry (penned in without legal guidance in July 1982) is truthful, and not the product of an "intent to deceive." As of the date that form was completed, the claims had not yet been drafted, and the scope of the claimed invention was still not known.

77.     Soundview submitted the Rule 131 Declaration in good faith. Soundview first obtained legal counsel, and relied on that legal counsel to determine whether swearing behind Chard was permitted. Soundview relied in good faith on legal advice. Soundview submitted the Rule 131 Declarations believing the co-inventors had met the legal requirements for a date of invention before Chard's effective date, namely an actual reduction to practice.

78.     The Rule 131 Declaration and accompanying remarks were prepared by Soundview's lawyer Gene Cummings, Esq. He performed the patent prosecution work for free. Separately, though, he was Soundview's licensing lawyer. His licensing representation agreement provided for a contingent fee based on licensing recoveries.

79.     Performing legal work on the basis of a contingent fee from potential licensing recoveries is probative of good faith, not bad. An attorney compensated for services based on recoveries under a patent will make every effort to guarantee that everything is done

correctly, that only truthful and material information is brought to the attention of the Patent Office and that no one involved attempts any deception.  To act otherwise would put the entire patent at risk of being held unenforceable because of inequitable conduct.

80.    Also probative of Soundview's good faith is its decision to invoke reexamination at all.  Soundview did not have to submit new prior art to the Patent Office, but it did.  Its purpose was to make sure the new prior art did not undermine patent validity.  It wanted to be sure it had a valid patent before notifying other companies of their need for or benefit from a patent license.

### Miscellaneous

81.    The '584 patent is expired.  The Court of Appeals affirmed this Court's non-infringement judgment.

82.    Sharp never pled inequitable conduct, and never pled it with particularity.

83.    Sharp did not show evidence of entitlement to attorney-fees based on inequitable conduct by the deadline for motions for attorney fees: December 2004.

### PROPOSED CONCLUSIONS OF LAW

1.    This Court lacks subject matter jurisdiction to adjudicate an inequitable conduct defense of a non-infringed, expired patent.

2.    Sharp also waived the inequitable conduct defense.

3.    In addition, Sharp waived any claim that alleged inequitable conduct entitles it to attorney fees.

4.    Patent prosecution occurs ex parte.  Applicants for a patent, as well as patent owners seeking confirmation of patentability through reexamination, owe a duty of candor to

the Patent Office. This duty of candor is governed by Patent Office rules, namely 37 CFR 1.56

(for an original prosecution) and 37 CFR 1.555 (for a reexamination).

5.      As the name implies, inequitable conduct is an equitable issue -- thus, the

ultimate determination of inequitable conduct is a matter committed to the discretion of the

trial court, not the jury.  Baxter Healthcare Corp. v. Spectramed Inc., 49 F.3d 1575 (Fed. Cir.

1995); Kingsdown Medical Consultants v. Hollister, Inc., 863 F.2d 867, 876 (Fed. Cir. 1988)

(en banc).

6.      The inequitable conduct defense is so overworked, the Federal Circuit has held

it is "cluttering up the patent system" E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,

849 F.2d 1430, 1439 (Fed. Cir. 1988), and has become plague:

> [T]he habit of charging inequitable conduct in almost every major patent case
> has become an absolute plague.  Reputable lawyers seem to feel compelled
> to make the charge against other reputable lawyers on the slenderest grounds,
> to represent their client's interests adequately, perhaps.  They get anywhere
> with the accusation in but a small percentage of the cases, but such charges
> are not inconsequential on that account.  They destroy the respect for one
> another's integrity, for being fellow members of an honorable profession, that
> used to make the bar a valuable help to the courts in making a sound
> disposition of their cases, and to sustain the good name of the bar itself.  A
> patent litigant should be made to feel, therefore, that an unsupported charge of
> "inequitable conduct in the Patent Office" is a negative contribution to the
> rightful administration of justice.  The charge was formerly known as "fraud on
> the Patent Office," a more pejorative term, but the change of name does not
> make the thing itself small any sweeter.

Burlington Industries, Inc. v. Dayco Corp. 849 F.2d 1418, 1422 (Fed. Cir. 1988) (emphasis

added); see also, FMC Corp. v. Manitowoc Co., Inc., 835 F.2d 1411, 1415 (Fed. Cir. 1987)

("'Inequitable conduct' is not, or should not be, a magic incantation to be asserted against

every patentee. Nor is that allegation established upon a mere showing that art or information having some degree of materiality was not disclosed."' emphasis added).

7.     The cornerstone of such a defense is intent -- there must be clear and convincing evidence of an *intent* to deceive the Patent Office.

8.     Sharp has the substantial burden of proving the existence of each and every element of the defense of inequitable conduct by clear and convincing evidence. Therma-Tru Corp. v. Peachtree Doors, 44 F.3d 988, 996 (Fed. Cir. 1995); Kingsdown, 863 F.2d at 876. Specifically, a party asserting an inequitable conduct defense arising from alleged failure to disclose prior art must prove by clear and convincing evidence:  (1) the fact that a reference constitutes "prior art", (2) the materiality of the prior art, (3)  knowledge chargeable to the patent applicant of the prior art's materiality, (4) the patent applicant's failure to disclose the prior art, and (5) intent to mislead the Patent Office. Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995).  Likewise, when the defense arises from an alleged misrepresentation, or alleged submission of false information, there must be proof of the misstated fact's materiality, or of the false information's materiality, coupled with an intent to deceive. Id.

9.     Information which is not as pertinent as that already before the Patent Office or which is cumulative is not material.   Id. at 1179.  Only when there exists a "substantial likelihood" that an examiner would consider a piece of prior art important in determining whether to allow an application to issue as a patent, is the prior art material.  J.P. Stevens & Co. v. Lex Tex Ltd., 747 F.2d 1553, 1559 (Fed. Cir. 1984).  Nor, of course, can a reference ever be material if, in fact, it does not qualify as "prior art" under the patent laws. Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 940 (Fed. Cir. 1990).

10.     Innuendo and conjecture cannot establish intent to deceive. See Hupp v. Siroflex of America, Inc., 122 F.3d 1456, 1466 (Fed. Cir. 1997) ("Although there may be special circumstances in which intent is appropriately deemed established by inference alone, there must be sufficient evidence to support such inference."); In re Hayes Microcomputer Products Patent Litigation, 982 F.2d 1527, 1546 ("Conjecture alone is not sufficient to show an intent to deceive to support the defense of inequitable conduct.").   No matter how "material" a particular piece of information may be, knowledge of the information and of its materiality alone will *never* support the separate element of "intent." Braun Inc. v. Dynamics Corp. Of America, 975 F.2d 815, 822 (Fed. Cir. 1992).   Even "studied ignorance" of material references, and "reckless indifference" to their impact on pending patent claims will not support a finding of intent to deceive the Patent Office. Hewlett-Packard Company v. Bausch & Lomb, Inc., 882 F.2d 1556, 1562 (Fed. Cir. 1989).  "Intent" must be separately proved.

11.     An unfounded assertion of inequitable conduct is "deplorable." Hayes, 982 F.2d at 1546.  Far too often, such accusations wrongly call into question the integrity of lawyers and inventors who have done nothing but perform "routine" acts of patent prosecution that are later, in the hindsight of litigation, blown up into charges of culpable conduct.   Northern Telecom, Inc., 908 F.2d at 939.  The Federal Circuit has labeled the habit of charging inequitable conduct "in every major patent case" an "absolute plague", saying

> A patent litigant should be made to feel ... that an unsupported  charge of 'inequitable conduct in the Patent Office' is a negative contribution to the rightful administration of justice.

Burlington Industries, Inc. v. Dayco Corporation, 849 F.2d 1418, 1422 (Fed. Cir. 1988).

12.     "In a case involving an omission of a material reference to the PTO, there must be clear and convincing evidence *that the applicant made a deliberate decision to withhold a known material reference*." Baxter International, Inc. v. McGaw, Inc., 149 F.3d 1321, 1329 (Fed. Cir. 1998) (emphasis added), citing Molins, 48 F.3d at 1181 (same).

13.     The penalty for inequitable conduct is the unenforceability of the whole patent. This extreme penalty requires heightened proof of wrongdoing.  "Conduct that requires forfeiture of all patent rights must be *deliberate*, and proved by clear and convincing evidence." Scripps Clinic & Research Foundation v. Genentech, Inc., 927 F.2d 1565, 1574 (Fed. Cir. 1991) (emphasis added).

14.     Sharp did not establish by clear and convincing evidence that Soundview committed inequitable conduct in connection with the Resolution or Petition.  It was not material information, and its non-submission was not deceptive.

15.     Sharp did not establish by clear and convincing evidence that Soundview committed inequitable conduct in connection with the Rule 131 declaration.  The declaration was true, and accurately set forth a date of invention sufficient to antedate the Chard reference.

16.     Subsequent testing or modification of an invention is simply not relevant to whether the earlier testing established an actual reduction to practice. DSL Dynamic Sciences Ltd. v. Union Switch & Signal, Inc., 928 F.2d 1122, 1125-26 (Fed. Cir. 1991). For example, in DSL, the Federal Circuit held the subsequent test failures did not refute that earlier testing using the prototype established the *claimed* invention worked for its intended purpose. Id. "A failure of several commercial devices allegedly made according to the [applicant's]

application long after the reduction to practice is insufficient to convince us that a device meeting the limitations of the count, was not adequately tested to establish a reduction to practice." Id. at 1126.

17.    Where an improvement to a television degraded performance of other aspects of the television, the predecessor to the Federal Circuit held that testing still established an actual reduction to practice. See Cochran v. Kresock, 530 F.2d 385, 391-92 (CCPA 1976). In Cochran, the claimed device improved reception of flesh tones on color television receivers but degraded other colors on the television screen, "desaturating" greens and reproducing them as blues. This is identical to the allegation that the May 12, 1982 incorporation of v-chip functionality would have degraded performance of closed captioning. The CCPA reversed the Patent Office's refusal to treat the date of a system test as the date of an actual reduction to practice, holding that reduction to practice "does not require that the invention be perfect or incapable of further improvement." Id. at 391. Cochran has not been overruled, and its holding is controlling authority based on the Federal Circuit's adoption of jurisdiction over patent appeals. South Corp. v. United States, 690 F.2d 1368, 1370-71 (Fed. Cir. 1982) (en banc).

18.    Under Cochran, the May 12, 1982 prototype of the '584 invention worked for its intended purpose. Whether or not closed captioning performance is degraded using the '584 patent's invention, Sharp has not shown by clear and convincing evidence that the *claimed* invention was not in existence and successfully tested by May 12, 1982. What constitutes the "intended purpose" for ascertaining whether there was an actual reduction to practice through testing is measured by the patent claim itself. Shurie v. Richmond, 699 F.2d 1156, 1160 (Fed.

Cir. 1983); <u>Nelson</u> v. <u>Bowley</u>, 626 F.2d 853, 856 (CCPA 1980); <u>Ciric</u> v. <u>Flanigen</u>, 511 F.2d

1182, 1185 (CCPA 1975); <u>Rey-Bellet</u> v. <u>Engelhardt</u>, 493 F.2d 1380, 1382-83 (CCPA 1974);

<u>D'Silva</u> v. <u>Drabek</u>, 214 USPQ 556, 562 (Bd. Pat. Int'f 1981).

19.    Evidence of good faith must be considered. Unrebutted evidence of good faith

precludes any finding of "intent to deceive." <u>Akron Polymer Container Corp.</u> v. <u>Exxel</u>

<u>Container, Inc.</u> 148 F.3d 1380, 1535-36 (Fed. Cir. 1998) (reversing district court finding of

intent to deceive as clearly erroneous because district court acknowledged, but did not give

weight to, evidence of good faith).

20.    Soundview acted in good faith, even if any information it submitted was

technically inaccurate. It relied on independent legal advice for its actions. Its entire course

of conduct during reexamination was to make sure its patent was valid, before beginning a

licensing campaign.

21.    Assuming, arguendo, there was technical inequitable conduct, it would not justify

a declaration of unenforceability, or any award of attorney fees. Soundview's litigation

positions stake out a substantial rebuttal to this defense. The substantiality of the rebuttals

show Soundview's litigation actions in enforcing the patent were in good faith. Soundview had

earlier moved for summary judgment of no inequitable conduct.

Respectfully submitted,

SOUNDVIEW TECHNOLOGIES, INC.


/s/ David Monastersky
John J. Bogdanski (ct06217)
David S. Monastersky (ct13319)
HOWD & LUDORF

65 Wethersfield Avenue
Hartford, Connecticut 06114
(860) 249-1361
Fax: (860) 522-9549

Raymond P. Niro (ct18107)
John C. Janka (ct20463)
Robert P. Greenspoon (ct21736)
Paul C. Gibbons (ct18826)
NIRO, SCAVONE, HALLER AND NIRO
181 West Madison Street, Suite 4600
Chicago, Illinois  60602
Phone: (312) 236-0733

Attorneys for Soundview Technologies, Inc.

## CERTIFICATE OF SERVICE

The undersigned counsel of record hereby certifies that a copy of the foregoing **SOUNDVIEW'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON SHARP'S ALLEGED INEQUITABLE CONDUCT DEFENSE** was served upon counsel for the below listed parties by overnight delivery on February 28, 2005:

/s/ David Monastersky

## SERVICE LIST

| Counsel for Consumer Electronics Association | |
|---|---|
| Counsel | Local Counsel |
| Peter J. Kadzik<br>R. Bruce Holcomb<br>Gary Hoffman<br>Kenneth W. Brothers<br>Jorge Kotelanski<br>Dickstein Shapiro Morin & Oshinsky<br>2101 L Street, N.W.<br>Washington, D.C. 20037<br>Tel: 202-785-9700<br>Fax: 202-887-0689<br><br>Tel: 202-775-4704 (Kadzik)<br>kadzik@dsmo.com<br><br>Tel: 202-828-2242 (Holcomb)<br>hoffman@dsmo.com | Connecticut<br>Jacqueline D. Bucar<br>Ben Solnit<br>Tim Jensen<br>Peter Sachner<br>Tyler Cooper & Alcorn<br>205 Church Street<br>New Haven, Connecticut 06509-1910<br>Tel: 203-784-8200<br>Fax: 203-865-7865<br>bucar@tylercooper.com<br><br>Tel: 203-784-8205 (Solnit)<br>solnit@tylercooper.com<br><br>Tel: 203-784-8228 (Jensen)<br>jensen@tylercooper.com<br><br>Tel: 203-784-8240 (Sachner)<br>sachner@tylercooper.com |

| Counsel for Mitsubishi Digital Electronics America | |
|---|---|
| Counsel | Local Counsel |
| Patent Infringement<br>Vincent J. Belusko<br>Eric Shih<br>Robert S. McArthur<br>Morrison & Foerster LLP<br>555 West Fifth Street<br>Los Angeles, California 90013-1024<br>Tel:    213-892-5200<br>Fax:    213-892-5454 | Connecticut<br>Joseph L. Clasen<br>James M. Ruel<br>David J. Burke<br>Robinson & Cole LLP<br>695 East Main Street<br>P.O. Box 10305<br>Stamford, CT 06901<br>Tel:    203-462-7510<br>Fax:    203-461-7599 |

| Counsel for Sharp Electronics Corporation | |
|---|---|
| Counsel | Local Counsel |
| Robert W. Adams<br>U.S. Mickey Gill<br>Nixon & Vanderhye, PC<br>1100 North Glebe Road, 8th Floor<br>Arlington, VA   22201-4714<br>Tel:   703-816-4000<br>Fax:   703-816-4100<br>email: rwa@nixonvan.com (Adams) | Connecticut<br>William M. Bloss<br>Alinor C. Sterling<br>Jacobs, Grudberg, Belt & Dow PC<br>350 Orange Street<br>New Haven, CT  06511<br>Tel:   203-772-3100 (x 271)<br>Fax:   203-772-1691<br>email: bbloss@jacobslaw.com |

| Counsel for Toshiba America Consumer Products, Inc. | |
|---|---|
| Counsel | Local Counsel |
| Larry S. Nixon<br>Michael Shea<br>Jeff Nelson<br>Nixon & Vanderhye, PC<br>1100 North Glebe Road<br>Arlington, VA   22201-4714<br>Tel:   703-816-4000<br>Fax:   703-816-4100<br>lsn@nixonvan.com | Connecticut<br>William M. Bloss<br>Alinor C. Sterling<br>Jacobs, Grudberg, Belt & Dow, P.C.<br>350 Orange Street., P.O. Box 606<br>New Haven, Connecticut 06503<br>Tel: 203-772-3100<br>Fax: 203-772-1691 |

**Counsel for Sony Electronics, Inc.  and Sony Corporation of America**

IP
Richard I.  Delucia
Richard Gresalfi
Elizabeth Gardner
Alex D.  Skucas
Jeffrey S.  Gerchuck
Thomas R. Makin
Kenyon & Kenyon LLP
One Broadway
New York, New York 10004
Tel:   212-425-7200
Fax:   212-425-5288
rdelucia@kenyon.com
egardner@kenyon.com

Antitrust
Richard M.  Steuer
Ian S.  Linker
Kaye, Scholer, Fierman, Hays & Handler
425 Park Avenue
New York, New York 10022-3598
Tel:   212-836-8000
Fax:   212-836-8689
rsteuer@kayescholer.com

Mark S.  Popofsky
Kaye, Scholer, Fierman, Hays & Handler
The McPherson Bldg.
901 Fifteenth Street, N.W., Suite 1100
Washington, D.C.   20005-2327
Tel: 202-682-3500
Fax: 202-682-3580

Jaime A.  Siegel
In-House Counsel
Sony Corporation of America
Sony Electronics, Inc.
One Sony Drive
Park Ridge, New Jersey 07656
Tel:   201-930-7415
Fax: 201-930-6854

Connecticut
Jacqueline D.  Bucar
Ben Solnit
Tim Jensen
Peter Sachner
Tyler, Cooper & Alcorn LLP
205 Church Street
P.O. Box 1936
New Haven, Ct.  06509-1910
Tel:   203-784-8200
Fax:   203-865-7865
bucar@tylercooper.com