UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Sony Electronics, Inc.,          :
et al.                           :
                                 :          Lead Docket
v.                               :          3:00cv754 (JBA)
                                 :
Soundview Technologies, Inc.     :

**Ruling on Non-Soundview Parties' Motion for Attorney Fees [Doc. #
473]**

On September 25, 2002, this Court granted the Non-Soundview
Parties'[1] Motion for Summary Judgment of Non-Infringement, see
Sony Elec. Inc. v. Soundview Techs, Inc., 225 F. Supp. 2d 164 (D.
Conn. 2002), and granted their motion for summary judgment on
Soundview's antitrust and unfair trade practices counterclaims on
August 28, 2003.  Thereafter, with agreement of the parties, the
Court entered partial final judgment as to those claims for which
summary judgment had been granted, and stayed the remaining
claims pending appeal.  See Order Entering Partial Final
Judgment, Sept. 26, 2003 [Doc. # 451]; Order of Stay Pending
Appeal, Sept. 26, 2003 [Doc. # 452].  On August 11, 2004, the
Federal Circuit affirmed this Court's grant of summary judgment
of non-infringement.

On December 8, 2004, the non-Soundview parties moved for
attorneys fees pursuant to 35 U.S.C. § 285 and 28 U.S.C. § 1927.

---

[1]  The "Non-Soundview Parties" were five television
manufacturers and two industry associations.

1

Toshiba America Consumer Products ("Toshiba"), Sony Corporation
of America, and Sony Electronics Inc. ("Sony") subsequently
withdrew their motion, and stipulated to the dismissal of all
claims by and against Toshiba, Sony, and Soundview.  Mitsubishi
Digital Electronics America ("Mitsubishi"), Sharp Electronics
Corp. ("Sharp"), the Consumer Electronics Association ("CEA"),
and the Electronic Industries alliance ("EIA") continue to pursue
the request for attorneys fees, and these four remaining parties
will be referred to in this decision as the "non-Soundview
parties."

## I.  35 U.S.C. § 285

Pursuant to 35 U.S.C. § 285, "[t]he court in exceptional
cases may award reasonable attorney fees to the prevailing
party."  "A determination whether to award attorney fees under 36
u.S.C. § 285 involves a two-step process.  First, a district
court must determine whether the prevailing party has proved by
clear and convincing evidence that the case is exceptional. . . .
Second, if the district court finds the case to be exceptional,
it must then determine whether an award of attorney fees is
appropriate."  Forest Laboratories, Inc. v. Abbott Laboratories,
339 F.3d 1324, 1327-28 (Fed. Cir. 2003) (citations omitted).  The
Federal Circuit defines "exceptional" as those cases involving
"inequitable conduct before the [Patent Office]; litigation
misconduct; vexatious, unjustified, and otherwise bad faith

2

litigation; a frivolous suit or willful infringement."  Id. at
1329 (citation and internal quotation marks omitted).  The non-
Soundview parties argue that this case is exceptional because
Soundview proceeded with this litigation in bad faith and with
reckless disregard.

### A.  Timeliness of Motion

At issue initially is the timeliness of this motion.
Soundview argues that the non-Soundview parties' motion for
attorneys fees is untimely under D. Conn. L. R. 11, which
provides that "[m]otions for attorneys' fees or sanctions shall
be filed with the Clerk and served on opposing parties within 30
days of the entry of judgment.  Any motions not complying with
this rule shall be denied."  Because this Court stayed the
remaining claims pending appeal, Soundview reads Rule 11 in
conjunction with the stay order to require the non-Soundview
parties to file their motion within 30 days after termination of
the appeal.  Because the mandate from the Federal Circuit was
returned and docketed on September 7, 2004, Soundview argues that
the deadline for filing the fee motion was October 7, and that
the non-Soundview parties missed this deadline by two months,
filing their motion on December 8.

In response, the non-Soundview parties argue that the
language of this Court's Order of Stay Pending Appeal does not
state that the stay expired with the appellate mandate, although

they nonetheless read the Order of Stay to mean that the deadline for filing a motion of attorneys' fees would start to run when the appellate mandate was returned to this Court — in this case, on September 7, 2004.  They also note, however, that on October 5, 2004, this Court issued a Notice to Counsel directing them to file a 26(f) Report on or before October 15, 2004.  The non-Soundview parties interpret the Stay and the Notice to Counsel as changes to the Local Rule deadline, which supercede the Local Rule because they were entered prior to the expiration of that deadline.  They argue that the Notice to Counsel, in particular, "extended any possible deadline for filing a motion for attorneys fees because it contemplated the entry of an Order that would set the appropriate deadlines."  Rep. Mem. at 9.  On November 10, 2004, moreover, a Scheduling Order was issued setting a briefing schedule, requiring attorneys fees motions to be filed on or before December 8, 2004.  See Scheduling Order [Doc. # 470]. Soundview argues that this order had the effect of extending the deadline.

The use of the Rule 54(b) procedure in this case allowed Soundview to immediately appeal this court's ruling on infringement, and stayed the remaining claims and motions, including for attorneys fees "pending appeal of the partial final judgment." Order of Stay Pending Appeal [Doc. # 452].  Thus, the requirement under Local Rule 11 that fee motions be filed within

4

30 days of entry of judgment does not by its terms apply, and this Court's stay order did not itself expressly set down a new deadline for filing such motions.  Given the ambiguity as to filing deadlines, and the fact that the parties have complied with the scheduling order that this Court entered on November 11, 2004, the Court deems the attorneys fees motion to be timely filed.

### B.  Merits

The non-Soundview parties argue that this case is exceptional because Soundview proceeded with this litigation in bad faith and with reckless disregard.  "In the context of fee awards to prevailing accused infringers, . . . § 285 is limited to circumstances in which it is necessary to prevent 'a gross injustice' to the accused infringer," such as arises from "vexatious, unjustified, or frivolous litigation." Forest Laboratories, 339 F.3d at 1329-30 (Fed. Cir. 2003).  To support an award of attorneys fees for a patent holder's pursuit of a baseless claim of infringement, the accused infringers must demonstrate that "both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless." Brooks Furniture Mfg., Inc. v. Dutailier Intern., 393 F.3d 1378, 1381 (Fed. Cir. 2005).  "Where the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is

proper of bad faith, whether grounded in or denominated wrongful intent, recklessness, or gross negligence."  Eltech Systems Corp. v. PPG Industries, Inc., 903 F.2d 805, 811 (Fed. Cir. 1990).

The non-Soundview parties contend first that the objective and subjective bad faith of Soundview's claim is evident from the fact that Soundview pursued two different claim constructions during the course of this litigation, which the non-Soundview parties argue were mutually exclusive, "fanciful" and unsupported by the claim language.  That the Federal Circuit rejected Soundview's appeal without opinion demonstrates the weakness of its claim, the non-Soundview parties argue.  They also argue that the subjective bad faith of Soundview is apparent because (a) the primary inventor of the '584 patent, Carl Elam, and one of Soundview's principals, David Schmidt, knew at least six years before this suit was filed that a microprocessor-based implementation for parental control would not meet the "separate rating signal line[s]" limitation of the '584 patent claims; (b) Soundview baselessly asserted that its '584 patent covered the v-chip standard that the television industry adopted regardless of how the standard was implemented, and alleged infringement without ever having seen the accused devices; and (c) Soundview filed suit after the non-Soundview parties warned Soundview that its claims of infringement were baseless and reckless.  Finally, the non-Soundview parties point to Soundview's refusal to dismiss

its antitrust claims after this Court found no infringement as evidence of its bad faith, because without a finding of infringement, such anti-trust claim was frivolous.

**1.  Claim Construction**

Soundview holds a patent (U.S. Patent No. 4,554,584) on a video and audio "blanking system" that allows television viewers to block programs carrying a certain program content rating. After Soundview attempted to license the "v-chip" technology used by the television industry, alleging infringement of the '584 patent, the non-Soundview parties sought a declaratory judgment of non-infringement, and moved for summary judgment.

Claim 1 of Soundview's '584 patent claims:

1.  A television editing system activated by transmitting digital codes for blanking at least part of the output of a receiver, in which the receiver includes at least a portion of a captioning circuit means for detecting digital data if present in the transmitted signal and supplying the data to a data bus;

    wherein said editing system comprises an auxiliary circuit which includes a character detector, rating select switch means, and blanking logic means;

    the character detector having inputs coupled to said data bus, means for decoding predetermined digital codes of a special set of characters, and output to rating signal lines, there being a separate rating signal line for each character of said special set;

    the rating select switch means having settings for different ratings; and

    the blanking logic means having logic circuits coupled

7

> to the rating signal lines and to the rating
> select switch means to compare the switch setting
> to signals on the rating signal lines, and in
> response to the comparison to generate a logic
> output signal condition for selectively either
> blanking or not blanking at least part of the
> receiver output.

'584 patent, Claim 1 (emphasis added).

In the claim construction before the Special Master and later as part of its summary judgment opposition, Soundview presented two different constructions of the claim language "separate rating signal line," which was the language ultimately determinative of its claim of infringement, and both of its interpretations were rejected by the Court. In its <u>Markman</u> brief before the Special Master, Soundview argued that the separate rating signal lines appeared internally in the character detector:

> When the claim refers to a 'separate rating signal line for
> each character of said special set,' that means the
> appearance of the first character in the sequence on the
> data bus will cause a separate <u>signal path</u> ("line") to be
> followed in the character detector [i.e., internally] than
> will the appearance of the second character in the sequence
> . . . .  These signal paths are called '<u>rating</u> signal lines'
> because in the aggregate, the two incoming bytes indicate to
> the rest of the circuitry what ratings data the broadcast
> signal contained.

Claim Construction Brief [Doc. # 230] at 16-17.

The Special Master rejected Soundview's "internal path" argument.  <u>See</u> Special Master's Final Report and Recommendation on Claim Construction [Doc. # 483, Ex. F] at 44 ("[I]t is clear

8

that the patentees christened as 'rating signal lines' those lines that receive the output from the 'means for decoding . . . and output' as set forth in the claim. . . . . Therefore, Soundview's argument that 'rating signal lines' means a 'path' that includes lines internal to the character detector, is simply contrary to the specification and the clear language of claim 1.").  Instead, the Special Master found that "[t]he 'rating signal lines' receive the output from the 'means for decoding . . . and output.'  Claim 1 requires that there is a 'separate rating signal line for each character of said special set' of characters, namely a 'separate rating signal line' for receiving each 'character' representing program content."[2]  Special Master's Final Report and Recommendation on Claim Construction ("Final Report") [Doc. # 483, Ex. F] at 45.

While Soundview acknowledges that its claim construction was deemed "contrary to the specification and clear language of claim 1," it argues that its interpretation of "rating signal line" before the Special Master depended on its reasonable construction of the term "character," which the Special Master acknowledged

---

[2]The Special Master noted that the specification explained that:
Gv is the video "G" rating signal line.
Pgv is the video "PG" rating signal line.
Rv is the video "R" rating signal line.
Ga is the audio "G" rating signal line.
PGa is the audio "PG" rating signal line.
Ra is the audio "R" rating signal line.

presented the more difficult question.  The Special Master also recognized that "the construction of 'rating signal lines' is inextricably linked to the proper construction of 'special set of characters. . . .'" Final Report [Doc. # 483, Ex. F] at 42.

Soundview's position on the meaning of the phrase "separate rating signal lines" was based in part on its view that the "special set of characters" referred to the two parts of the rating code, see Claim Construction Brief [Doc. # 483, Ex. X] at 15-18 (citing Tables 1 and 2 of '584 patent),[3] so that the "separate rating signal line for each character of said special set" referred to the fact that each part of the rating code followed a separate signal path within the character detector. While, as the non-Soundview parties note, the claim language requires that the character detector provides output to the rating signal lines, not that the rating signal lines operate

_____

[3]  Table 1 illustrates the following:

Typical ASCII Rating Codes

|     | First Character | Second Character |
| --- | --- | --- |
| Gv | X0010110 | X1010100 |
| PGv | X0010110 | X1011001 |
| Rv | X0010110 | X1010001 |
| Ga | X0010110 | X1000001 |
| PGa | X0010110 | X1010111 |
| Ra | X0010110 | X1011000 |

internally within the character detector, given the ambiguity in the term "character" in the patent, Soundview's interpretation cannot be said to lack all grounding in the claim language.

Soundview adopted a different construction of the "separate rating signal line" limitation in its patent in opposing the non-Soundview parties' motion for summary judgment of non-infringement, describing it as a distinct pattern on the conductors.  In particular, Soundview argued that the pattern of 0s and 1s on a set of conductors representing a rating could be considered the rating signal line, and that the use of the same physical material as the rating signal line from one rating to the next did not "refute the fact that the distinct signal on the physical conductors makes one rating signal line a separate electrical structure from another rating's." Soundview's Memorandum in Opposition [Doc. # 338] at 19.  The non-Soundview parties describe this interpretation as fanciful, and this Court concluded on summary judgment that Soundview's proposed construction of rating signal lines "lacks any support in the text of the claims, and is clearly belied by the remainder of the specification." Sony Elec., 225 F. Supp. 2d at 174.

While Soundview urged an immeasurably more convoluted construction than that suggested by the specification (e.g., "Gv is the video "G" rating signal line . . ."), it had some grounding in common dictionary terms and some specification

11

figures. Soundview's construction relies on a "line" being understood as a set of conductors.  It points to the definition of "line" in the McGraw-Hill Dictionary of Scientific and Technical Terms, which incorporates the definition of "transmission line," that is, "A system of conductors, such as wires, waveguides, or coaxial cables, suitable for conducting electric power or signals efficiently between two or more terminals."  Moreover, Soundview points to the definition of "separate" in Webster's Ninth New Collegiate Dictionary, which can mean "dissimilar in nature or identity *syn* see DISTINCT." Based on these dictionary definitions, Soundview argues that it was reasonable for it to interpret the claim language "separate rating signal lines" as "a set of one or more conductors for each rating, where the set is distinct from (i.e. dissimilar to) those sets corresponding to other ratings."  Soundview states that this construction accurately described the patent's preferred embodiment, and was supported by its two infringement experts.

Soundview also maintains that the patent itself provides textual support, as Fig. 1 of the patent shows as ASCII character detector 2A that has a single output line 56.  Numeral 56 is referred to at different points in the specification as "output line 56" (5:67), "rating lines 56" (6:60), as "six lines of cable 56" (7:13, 7:39-40), and as "cable 56" (8:40).  The patent also states, "[i]n the embodiment which was tested, six characters are

decoded and the output line 56 has six conductors."  (5:67-68).

Soundview's construction, however, ignored other aspects of the claim language and specification.  As this Court noted in its summary judgment ruling, "all descriptions of the 'rating signal lines' point to the lines that cross cable 56 (i.e., the lines specifically labeled 'Gv,' 'PGv,' etc., in Figures 2A, 2B, 2C, and 2D)," and there was an "absence of any indication in the claims or the specification that a rating signal line means a 'pattern' on cable 56, in light of the explicit language to the contrary in the Detailed Description of the Drawing."  Sony Elec., 225 F. Supp. 2d at 175.

Nonetheless, this Court declines to draw an inference of bad faith.  While Soundview's construction lacked merit, it was not so clearly frivolous as would support an inference that Soundview knew at the time it alleged infringement that its construction could not lawfully prevail.  Soundview's interpretation had some grounding in basic claim construction principles, and, while perhaps inexplicably dismissive of the fact that the specification showed multiple structural rating signal lines crossing cable 56, its construction did not contradict any controlling authority.  Importantly, moreover, two experts supported Soundview's construction.

That Soundview adopted a different construction of "separate rating signal lines" at summary judgment from its construction

before the Special Master also does not necessarily demonstrate bad faith, because Soundview was entitled to argue in the alternative.  As Soundview's interpretation of "separate rating signal lines" was interdependent with the construction of other claim terms, it was entitled to adjust its arguments in an effort to adapt to the Special Master's recommended claim construction.

### 2.   Other Evidence of Claimed Subjective Bad Faith

####     a.   Elam memo

The non-Soundview parties contend that Soundview in fact knew that microprocessor-based blanking systems would not infringe its '584 patent, and points to a 1994 memo from the patent's inventor.  In 1994, David Schmidt, one of the principals of Soundview, asked Carl Elam, the primary inventor of the '584 patent, whether the patent limitation of "separate rating signal line[s]" made the '584 patent applicable to microprocessor-based parental control systems.  Elam relayed the question to his attorney in a memo asking, "In your opinion, would it be an infringement upon this patent if an implementation using a microprocessor were used, which achieved the same result with software and avoided specifically using the 'rating signal lines.'" Memorandum from Carl Elam to Thomas Kundert and Bernard Franz, August 29, 1994 [Doc. # 475, Ex. 1] at ELAM 1289.

The memo continues:

   The reason for asking this question is that a company named
   Eclipse Products Inc. of Darien, Ct is attempting to promote

14

> this concept to the TV Cable industry.  The owner, Mr. David
> Schmidt, after getting into his effort discovered my patent
> and approached me about including my patent as part of his
> group of patents he is promoting.  In his effort he has had
> a legal review performed on the group of patents to
> determine their validity etc. . . . The patent attorneys
> which performed the review indicated the use of 'rating
> signal lines' in Claim # 1 may tend to limit the scope of my
> patent allowing alternative microprocessor implementations.
> For my personal knowledge and benefit, I am interested in
> your opinion on this matter.

Although Elam's memo refers to legal advice that the use of "separate rating signal lines" "may tend to limit the scope" of his patent, without more detail, it is unclear whether Soundview was advised that microprocessors were not in fact covered by the claim language, or merely that the patent's application to microprocessors presented a close question.  Moreover, Elam's question as to infringement by microprocessor-based parental control systems does not itself suggest that he or Soundview's principals had reached the conclusion that such a device would not infringe the '584 patent.  A handwritten note on the memo, which Soundview identifies as being written by Elam's attorney, suggests legal advice that microprocessors could be infringing under the doctrine of equivalents.  The handwritten note states "Bernie Franz called 2 Sept 94.  Cited 'doctrine of equivalence' for an element such as 'rating lines.'  3 tests: (1) Same Function; (2) Same way; (3) Same results."  Id.  Elam's memo thus does not itself establish that Soundview knew that microprocessor-based parental control systems would not infringe

its patent.

b.   <u>Pre-Litigation Conduct by Soundview</u>

The non-Soundview parties also argue that Soundview's efforts to license the television industry prior to bringing suit demonstrate its bad faith, as Soundview alleged that the V-chip standard that the television industry had adopted infringed the '584 patent, and accused television manufacturers of infringement without ever having seen the accused devices.  For example, Soundview's April 30, 1998 letter to Sharp stated:

> Among other features, the '584 patent protects, as the exclusive property of Soundview, the use of the closed captioning channel in a U.S. standard television broadcast to convey program rating information . . .  We understand that your company is currently designing and will soon manufacture and sell V-chip equipped TV receivers, video recorders, and possibly V-chip adapters and cable set-top boxes which will infringe this patent.

Letter from Gerald D. Hosier to K. Kuratain, Sharp Corporation, Apr. 30, 1998 [Doc. # 475, Ex. 8] at SVW11940-41; <u>see</u> <u>also</u> Letter from Gerald D. Hosier to Stoshi Usami, Apr. 30, 1998 [Doc. # 475, Ex. 5] at SVW11946.

The non-Soundview parties argue that Soundview's representation was clearly erroneous because the V-chip standard provides only for the transport of content advisory information, is silent on how televisions process the information to provide blanking, and does not require the use of a separate rating signal line for each different rating.

While "a patentee's bad-faith business conduct toward an accused infringer prior to litigation" cannot form the basis of a

16

finding of exceptionality, <u>Forest Laboratories</u>, 339 F.3d at 1329,
pre-litigation accusations of infringement that are made without
the requisite investigation of the accused products may be
relevant to the inquiry into whether Soundview acted in good
faith in bringing its infringement claim.  The evidence presented
by the non-Soundview parties, however, does not prove by clear
and convincing evidence that Soundview failed to conduct an
investigation or acted in bad faith in bringing its infringement
claim.  Although Soundview's April 30, 1998 letters to television
manufacturers broadly accused them of infringing by use of the V-
chip standard, shortly thereafter Soundview analyzed each
manufacturer's television components, and in later communications
Soundview reported the results of its investigation and more
narrowly addressed how it believed the technology infringed
particular claim language.  <u>See</u>, <u>e.g.</u>, Letter from Gerald D.
Hosier to Robert W. Adams, Sharp, Sept. 29, 1999 [Doc. # 483, Ex.
W] at SVW 13653-58.  Where it had not studied the accused
televisions, Soundview sought further information before pursuing
its accusation of infringement.  <u>See</u> Letter from Gerald Hosier to
David L. Fehrman, July 9, 1999 [Doc. # 475, Ex. 12] ("At this
time our client does not have sufficient information regarding
Mitsubishi's implementation of V-chip technology in its consumer
television products to determine whether these products are
infringing the subject patents.  If you will provide us with

details on Mitsubishi's implementation, including pertinent circuitry and software, we will attempt to make a determination on infringement.").

Further, while David Schmidt, one of Soundview's principals, acknowledged at his deposition that the phrase "separate rating signal lines" did not appear in the V-chip EIA 608 and 744 standards, and that he did not believe that there was "any circuitry described in the standard that would define a character detector," he also testified that "it would become fairly obvious to somebody skilled in the art of television manufacturing what the decoder would necessarily look like in order to implement the standard."  Schmidt Deposition [Doc. # 483, Ex. S] at 539:15-21. Schmidt also testified that Soundview was "comfortable that the microprocessor implementation would be covered by the terms of the 584 patent," id. at 581:22-24, and that he did not believe that the word "line" was indicative only of a single conductor, id. at 587:19-22.

More importantly, the non-Soundview parties have not demonstrated that Soundview failed to conduct an adequate investigation before accusing them of infringement.  Soundview has submitted the declaration of Eugene Cummings, who states that as counsel for Soundview, he "arranged for the acquisition of numerous television receivers for disassembly and comparison to the Soundview patent claims," as soon as the v-chip equipped

18

televisions came on the market, and "collected (a) specifications and descriptive literature on various other television receivers" from several manufacturers, along with "(b) specifications and descriptive literature on various integrated circuit components found in these television receivers."  Declaration of Eugene Cummings [Doc. # 483, Ex. U] at ¶ 3.  Cummings had the acquired television receivers analyzed by an engineering consulting firm, and he and his staff construed the claims of the Soundview patents, compared the patent claims to the analyzed models, and offered an opinion that the technology infringed Soundview's '584 patent.  <u>Id</u>. at ¶¶ 4-5.  On its face, such an investigation indicates that Soundview acted with reasonable diligence, and the non-Soundview parties have not presented evidence suggesting that the investigation was a sham, with an predetermined result.

As Soundview had what appears to be a good faith legal opinion construing the claim and concluding that the non-Soundview parties' televisions infringed, the fact that the non-Soundview parties warned Soundview that its infringement claim lacked merit prior to Soundview's commencement of this suit is of little moment.  <u>See</u>, <u>e.g</u>., Letter from Robert W. Adams, Nixon & Vanderhye P.C. to Gerland Hosier, November 9, 1999 [Doc. # 475, Ex. 21] (asserting several bases for non-infringement by Sharp, including that "Sharp's chips do not utilize the claimed 'separate rating signal line' structure or function.").  A party

is not bound by its adversary's opinion of the strength of its case.

Finally, Soundview's licensing of other television manufacturers is entitled to some weight in assessing whether Soundview acted in bad faith in bringing this suit. As Soundview notes, three-quarters of the television industry obtained licenses from Soundview under its patent,[4] internal documents reveal that at least two manufacturers themselves expressed a belief that their televisions infringed the '584 patent, <u>see</u> Hitachi V-Chip Patent Review notes [Doc. # 483, Ex. A] ("EIA-608/EIA-744 Infringe Claim 1" of '584 patent) (notes indicate comments were "by Hitachi Design, <u>not</u> patent counsel"); V-Chip Patent list [Doc. # 483, Ex. C] (indicating '584 patent was "impossible to get around"), and the trade association EIA/CEMA indicated that Soundview's patent was among the "most relevant" patents to the V-Chip standard. CEMA Letter [Doc. # 483, Ex. D]. While it is possible to speculate, as the non-Soundview parties urge, that some of the manufacturers accepted licenses as a part of a litigation-averse business decision, or that upon further review, the manufacturers reversed their initial assessment of infringement, there is no evidence in the record supporting such

---

[4]Soundview's licensees include Philips (11.4% market share), Hitachi (1%), Pioneer (o.1%), Thomson (RCA) (17%), Matsushita (Panasonic) (5.8%), Sanyo (11%), Funai (8.2%), Daewoo (1.5%), LG (Zenith (5.4%), Samsung (3.7%), JVA (3.3%), Orion (5.6%) and Tatung (0.0%). [Doc. # 483, Ex. B].

speculation.  Soundview commenced this suit after investigation
and analysis of the accused infringers' technology, and after
successfully licensing much of the television industry, which the
non-Soundview parties have not rebutted, and which causes them to
fall short of their burden of showing bad faith by clear and
convincing evidence.  Thus, although the television manufacturers
fiercely disputed the accusation of infringement, and Soundview
was aware of weaknesses in its infringement claim prior to
bringing suit, on balance the non-Soundview parties have not
proved that Soundview brought this litigation in bad faith.

## II.  28 U.S.C. § 1927

The non-Soundview parties also move for attorneys fees based
on 28 U.S.C. § 1927, which provides:

> Any attorney or other person admitted to conduct cases in
> any court of the United States or any Territory thereof who
> so multiplies the proceedings in any case unreasonably and
> vexatiously may be required by the court to satisfy
> personally the excess costs, expenses, and attorneys' fees
> reasonably incurred because of such conduct.

As to this statute, the non-Soundview parties argue that "as the
suit progressed and Soundview's outrageous positions began to
fail again and again, it was completely unreasonable for
Soundview to continue to maintain that it had a meritorious case.
Yet it continued to press its baseless assertions time and time
again."  Memorandum in Support of the Non-Soundview Parties'
Motion for Attorney Fees [Doc. # 474] at 24.  They focus in
particular on the pursuit of the antitrust claim after the

finding of no infringement.  Soundview's antitrust counterclaims accused the non-Soundview parties of engaging in a conspiracy to fix licensing fees for Soundview's patent and to refuse to deal with Soundview.  On summary judgment, this Court concluded that because no television manufacturer produced a product requiring a license under Soundview's patent, it was not entitled to an antitrust remedy.

Soundview's pursuit of its antitrust claim after the finding of no-infringement must be deemed frivolous.  As this Court stated in its summary judgment decision, "even if an illegal agreement is proved to be one reason the Non-Soundview Parties refused to license Soundview's patent, the proximate or legal cause of Soundview's licensing revenue loss is that no television manufacturer (whether part of the Non-Soundview Parties or not) needed a license of the patent to manufacture televisions in compliance with FCC and industry standards for program content blocking."  Sony Electronics, Inc. v. Soundview Technoligies, Inc., 281 F. Supp. 2d 399, 402 (D. Conn. 2003).  In this context, as discussed in the summary judgment ruling, the licensing settlements reached with other manufacturers prior to litigation could not establish a "market for licenses" supporting Soundview's antitrust claim.

Soundview notes that this Court permitted further briefing on the antitrust issue after the decision on infringement was

22

issued.  Such briefing was permitted after Soundview represented that it believed it continued to have a viable theory of antitrust recovery; Soundview's pursuit of its claim was its choice.  Because it should have been clear to Soundview that its antitrust claim was extinguished by the summary judgment of non-infringement, its continued pursuit of the claim can only be viewed as a vexatious effort to multiply the proceedings.  Accordingly, the Court grants the non-Soundview parties' motion under Section 1927, and will award attorneys fees generated in defending the antitrust claim after the non-infringement decision.

## III.  Conclusion

For the foregoing reasons, the non-Soundview Parties' Motion for Attorneys Fees [Doc. # 473] is DENIED in part, as to the attorneys fees pursuant to 35 U.S.C. § 285, and GRANTED in part, as to attorneys fees pursuant to 28 U.S.C. § 1927.  The non-Soundview parties shall submit their claim for reasonable attorney fees and costs and supporting documentation within 30 days.  Soundview's response shall be filed 21 days thereafter.

IT IS SO ORDERED.

/s/

_____
_____Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this 12th day of July, 2005.**

23