channel to convey program
rating info.

**EIA-608/EIA-744 INFRINGE CLAIM 1**

(Ex. A). And Philips, Sanyo (both now licensees), Toshiba and the EIA sent representatives to the FCC who told commissioners that "[f]ailure to secure [a Soundview] license may cause manufacturers to be forced to choose between willful IP infringement or to cease producing television receivers...." (Ex. N).

**B.      Soundview Applied The Same Scope To The Claims That The Patent Office Did**

Soundview's claim interpretation cannot have been in bad faith, since it was quite similar to the claim interpretation applied by the Patent Office during reexamination.

The re-examination Examiner's prior-art rejections support Soundview's contentions about the scope of the claims, suggesting that Sony's argument that distinct patterns on a register-to-ALU microprocessor bus are excluded from the literal scope of the claims was not how the PTO interpreted the claims.

In an Office Action dated April 30, 1997, the Examiner issued two separate obviousness rejections of claim 1: under a patent to Chard and a patent to Keiser (Ex. O). In these rejections, the Examiner indicated the entire "character detector" of claim 1 (i.e., including the "separate rating signal line" limitation) was included in each reference (Ex. O).

Neither Chard nor Keiser disclose separate pulses-on-single-conductors, with a non-shared single conductor used for each rating (Ex. P; Ex. Q). Chard, in fact, expressly states that its "teletext decoder 40" sends an "address coding" to the pertinent comparator:

> Upon the [d]ecoder 40 identifying a row address coding on the relevant teletext page, this address coding is immediately output to a comparator 42 or 43, the codings GV1

18

to 4 being output to the comparator 42 and the codings GS1 to 4 to the comparator 43.

(Ex. Q, at 6:45-53). These codings (e.g., GV1 to 4 in the case of video) represent "four gradings of possibly objectionable visual events" (Ex. Q, at 5:27-31), and "are constituted by respective row addresses of a predetermined page of a teletext service" (Ex. Q, at 5:39-40). The "row address," in turn, is a "byte" of data (i.e., a pattern of eight contiguous bits) (Ex. Q, at 5:13-26 and Fig. 2).

Hence, the Examiner clearly construed the "separate rating signal line" claim language to encompass Chard's four respective 8-bit codes sent from the decoder 40 to the comparator 42 on a set of conductors, where each code respectively represents one of GV1 through GV4. Put another way, the Examiner recognized that claim 1 included (not excluded) transmission of a decoded rating code to comparison logic in the form of a bit-pattern on a set of conductors, where there is a distinct bit pattern for every rating. Had this Court applied the same scope to the claims that the Patent Office did, it would have found the accused television sets have a "separate rating signal line" for exactly the same reason that everyone agreed Chard did — a bit-pattern goes from the decoder to the comparison logic on a set of conductors, where there is a distinct bit pattern for every rating. The Patent Office deemed Soundview's construction to be reasonable, since it applied a very similar interpretation to reject Soundview's patent claims over prior art which in this pertinent respect was indistinguishable from the accused products.

Even though the Court ruled, in effect, that the proper construction was narrower than the Patent Office's construction, that does not change the fact that such a construction was *reasonable*. The examiner's view of what is covered under the claims is evidence of the claim's scope. Metabolite Labs., Inc. v. Lab. Corp. Of Am. Holdings, 370 F.3d 1354, 1367-1368 (Fed. Cir. 2004).

19

In <u>Pharmacia & Upjohn Co.</u> v. <u>Mylan Pharmaceuticals, Inc.</u>, 182 F.3d 1356, 1361 (Fed. Cir. 1999), one of the reasons the Federal Circuit held the losing patentee's claim interpretation did not render the case exceptional was that a prior tribunal had endorsed it.  And although some cases suggest that claim construction during patent examination can be broader than in litigation (because claims can be modified during examination but not during litigation), no case suggests that the PTO's view of claim scope is irrelevant in subsequent litigation. See <u>Metabolite</u>, above.  Indeed, much of the process of claim interpretation is an inquiry into how the PTO viewed the claims.  Sony itself supported its proposed claim interpretation with arguments about what the PTO thought the claims meant. (E.g., Ex. F, Final Report at 63).

Soundview's use of the Patent Office's own claim interpretation supports that this case was not "exceptional" and that attorney fees are not warranted.  Soundview's claim interpretation was not "objectively baseless." <u>Brooks Furniture</u>, 2005 U.S. App. LEXIS 33, at *7.

## VI.    <u>SOUNDVIEW ACTED IN GOOD FAITH BEFORE FILING SUIT</u>

The Sony parties offer only two pieces of alleged evidence that Soundview held a subjective belief that no one infringed, which is the other requirement that must be satisfied by clear and convincing evidence for an "exceptional case" finding. <u>Id.</u>  Neither shows any subjective belief that losing this case was foreordained.

First, the Sony parties point to co-inventor Carl Elam's hypothetical question in 1994 (five years before the first v-chip television rolled off an assembly line) to his former Air Force attorneys. As shown in section VI.A. below, this hypothetical question proves nothing, and in any event the Air Force attorney answered by saying infringement liability was still possible.

Second, the Sony parties misinterpret testimony by Soundview's David Schmidt to argue that "under penalty of perjury in the present case, suddenly Soundview could not find a requirement of separate rating signal lines in the v-chip standard." (Sony Br. 10). As shown in section VI.B. below, the parts of Mr. Schmidt's testimony the Sony parties fail to cite show Mr. Schmidt's and Soundview's reasonable belief that use of the v-chip standard *induces* the implementation of the separate rating signal lines of the '584 patent.

Finally, section VI.C. demonstrates that Soundview conducted an adequate prefiling investigation.

### A.    Attacks On Major Elam Are Unfounded

The Sony parties speculate that co-inventor Elam "knew that a microprocessor-based implementation for parental control would not meet the 'separate rating signal line[s]' limitation of the '584 patent claims." (Sony Br. 5). Rather than cite deposition testimony to that effect (since there is none), they cite a 1994 letter that Major Elam wrote to an Air Force patent attorney. In the letter, Major Elam poses the following hypothetical question to the military attorney:

> [I]n your opinion, would it be an <u>infringement</u> upon this patent *if* an implementation using a <u>microprocessor</u> were used, which achieved the same result with software and avoided specifically using the "rating signal lines".

(Ex. 1 to Sony Parties' Fee Motion, italics added). Hence, this hypothetical question posed whether there was still infringement *if* a microprocessor was implemented in a way that *avoided* using the "rating signal lines."

The Air Force attorney answered yes, there could still be infringement. In the part of the exhibit the Sony parties failed to cite, Major Elam wrote in his own handwriting the following:

> Bernie Franz called 2 Sept. 94.

cited "doctrine of equivalence" for an element such as "rating lines".

    3 tests:

    (1) Same Function

    (2) Same Way

    (3) Same Results

(Ex. 1 to Sony Parties' Fee Motion).

The Sony parties misrepresent the question, and then (perhaps worse) ignore the answer. The Sony parties say this question means that "as early as 1994, Elam the inventor, Schmidt the speculator and the speculator's attorneys recognized that televisions that used microprocessors for parental control would not have the 'separate rating signal line[s] that the '584 patent requires." (Sony Br. 7). That is not true. The question did not express a **belief** that microprocessors did not have "rating signal lines." Instead, the question asked if there would still be infringement **if** a microprocessor implementation did not use "rating signal lines." Moreover, the Air Force attorney's answer puts to rest any notion that Major Elam felt there was no basis to allege infringement years later when televisions first contained v-chips. This exchange shows Major Elam's reasonable belief that there **could** be infringement. At his deposition, Major Elam confirmed that this 1994 exchange did not mean he believed microprocessors were inherently free of infringement. (Ex. R, Elam Dep. at 406-07). It is ironic that the Sony parties misrepresent Major Elam's writings, yet completely ignore the writings of television manufacturers admitting their belief that the v-chip standard "INFRINGES CLAIM 1" of the Soundview patent. See section V.A, above.

## B.    Mr. Schmidt's Testimony Shows Soundview's Reasonable Belief That The V-Chip Standard Induces Implementation Of Separate Rating Signal Lines

The Sony parties also wrongly argue that "under penalty of perjury in the present case, suddenly Soundview could not find a requirement of separate rating signal lines in the v-chip standard." (Sony Br. 10). But Mr. Schmidt just testified the standard did not have those words:

Q.  Now, there's also no description as we discussed before in EIA 608 and 744 of the concept of separate rating signal lines, correct?

A.  I don't know about the concept.  I would imagine those specific words probably don't appear,

(Ex. S, Schmidt Dep. at 410).  The Sony parties also rely on Mr. Schmidt's observations that the written standard does not literally "address that type of functionality" (Sony Br. 10) and that the standard does not describe any circuitry for a character detector (Sony Br. 10).

The overlooked parts of Mr. Schmidt's testimony illustrates that Mr. Schmidt made it very clear that television manufacturers already know what circuitry is involved — a view vindicated by Hitachi's admissions. See section V.A, above.

Q.  Can you describe for me any of the circuitry that is required in either 608 or 744 or any of the subsequent amendments that would constitute a character decoder?

A.  I don't believe there's any circuitry described in the standard that would define a character decoder.  I think it would become fairly obvious to somebody skilled in the art of television manufacturing *what the decoder would necessarily look like in order to implement the standard*.

(Ex. S, Schmidt Dep. at 539, emphasis added).  Mr. Schmidt went on to testify that he believed the v-chip standards *taught the necessity of* including claim 1's "auxiliary circuit" (i.e., the limitation which includes the disputed "separate rating signal lines"):

Q.  Do any part of the standards, either 608 or 744 or any of their amendments, teach how to design and implement an auxiliary circuit as that is used in claim 1 of the Elam patent?

A.  I don't know that they teach how to design but they *would certainly suggest the necessity of an auxiliary circuit*.

Q.  How do they suggest the necessity of an auxiliary circuit as auxiliary circuit is used in claim 1?  What are you referring to, please?

A.    Answers to interrogatories. [Colloquy omitted]. Page number 5. And I read, "Section 6.5.1.5 of EIA 608A actively induces set makers to incorporate an auxiliary circuit for performing the V-chip functionality."

(Ex. S, Schmidt Dep. at 539-40, emphasis added).   Mr. Schmidt helped write the pertinent

interrogatory answers (Ex. S, Schmidt Dep. at 541), which detail how (at least as Soundview

believed) the v-chip standard made television manufacturers who used microprocessors infringe each

element of claim 1 of the '584 patent. (See esp. entry for "separate rating signal line," Ex. T at 8).

In addition to Soundview's belief that the v-chip standard induced set makers to deploy

separate rating signal lines, the Sony parties ignore other significant aspects of Mr. Schmidt's

testimony.   When Soundview was designing its own microprocessor-based v-chip product in

compliance with the v-chip standard, Soundview believed it "would be covered by the claims of the

584 patent." (Ex. S, Schmidt Dep. at 581).  The use of a microprocessor (just like the Sony parties'

use here) supported that belief:

Q.    So the use of the microprocessor, did that cause Soundview to form any belief that it would not be protected by the 584 patent?

A.    No, we were *fully comfortable that the microprocessor implementation would be covered by the terms of the 584 patent*.

(Ex. S, Schmidt Dep. at 581, emphasis added).  As part of this "full comfort" that microprocessor

implementations were covered, Mr. Schmidt affirmed that Soundview believed that the term "line"

could be construed to mean more than just a single conductor (Ex. S, Schmidt Dep. at 587) —

entirely consistent with Soundview's claim construction arguments to the Court. (See also Ex. S,

Schmidt Dep. at 595-96).  Again, what is relevant now is not whether Mr. Schmidt and Soundview

were right, but rather they truly believed in the positions they took. Brooks, 2005 U.S. App. LEXIS

24

33, at *7. The Sony parties offer no evidence (since there is none) calling into question Soundview's

confidence it had a meritorious case.

### C.    Soundview's Pre-Filing Investigation Shows Soundview's Good Faith

#### 1.    Pre-Filing Investigations Are Not Relevant To "Exceptional Case" Determinations

To the extent based on pre-filing activities, the Sony parties' briefing is irrelevant to the

question of whether this case was brought or pursued in bad faith.  Neither Soundview's pre-filing

licensing activities nor its pre-filing investigation may be used to determine whether this was an

exceptional case.

> [W]e have . . . upheld findings of exceptionality to prevent such an injustice only when the patentee has procured its patent in bad faith (i.e., committed inequitable conduct before the Patent Office) or has litigated its claim of infringement in bad faith.
>
> We have not, however, upheld a finding of exceptionality based on a patentee's bad-faith business conduct toward an accused infringer prior to litigation, and we decline to expand the scope of the statutory term "exceptional" in this manner.
>
> \* \* \*
>
> Although a lawsuit pursued in bad faith is a sufficient basis for imposing attorney fees under [35 U.S.C.] §285, *such bad faith requires not misleading pre-litigation conduct*, but vexatious, unjustified, or frivolous litigation.

See Forest Laboratories, Inc. v. Abbott Laboratories, 339 F.3d 1324, 1329-30 (Fed. Cir. 2003)

(emphasis added).  An inadequate pre-filing investigation is not enough to establish "bad faith" that

makes a case "exceptional." Epcon Gas Systems, Inc. v. Bauer Compressors, Inc., 279 F.3d 1022,

1035 (Fed. Cir. 2002) ("Assuming, *arguendo*, that Bauer is correct that Epcon failed to perform an

adequate investigation prior to filing the complaint, this fact does not mandate a finding that this case

is exceptional, or that Bauer is entitled to any attorney fees."); see also Hoffman-LaRoche, Inc. v. Invamed, Inc., 213 F.3d 1359, 1363 (Fed. Cir. 2000).

Likewise, the only source for the requirement of pre-filing investigation is Fed.R.Civ.P. 11. Ulead Systems, Inc. v. Lex Computer & Mgt. Corp., 351 F.3d 1139, 1150 (Fed. Cir. 2003). This is important because Rule 11 imposes strict procedural requirements that must be satisfied before any violation can be found. Among the requirements are presentation to the opposing party so as to afford a 21 day grace period for reconsideration before any Rule 11 motion can be filed. Fed.R.Civ.P. 11(c)(1). The Sony parties did not comply with this procedure, which would have required them to present a draft Rule 11 motion to Soundview before final judgment.

## 2.    Soundview Conducted A Reasonable Investigation

Even if Soundview's pre-filing investigation was relevant to the "exceptional case" question (which it is not), Soundview conducted a reasonable one. The Sony parties falsely contend that "[e]ven a year into its licensing campaign, Hosier admitted that Soundview had not studied the accused televisions to determine whether the products infringed the '584 patent." (Sony Br. 9). Soundview did study the accused televisions (Ex. U, Cummings Decl. ¶¶ 3-7), and the Sony parties know it.

A pre-filing investigation is adequate when an attorney compares an accused device with the construed patent claims. Antonious, 275 F.3d at 1073-74 (case decided under Rule 11). A patentee may rely on pre-filing letters sent to an opponent to evidence its reasonable pre-filing investigation. See Fantasy Sports Properties Inc. v. Sportsline.com, inc., 287 F.3d 1108, 1120 (Fed. Cir. 2002). It is not necessary to acquire a sample of an accused product (although Soundview did so) if other

obtainable information supports the infringement analysis. See Q-Pharma, 360 F.3d at 1302. In addition, the Federal Circuit has held:

> To be sure, when a number of different products are charged with infringement it is not always necessary for the plaintiff's attorneys to inspect each product separately to verify the facts on which the plaintiff bases its infringement allegations.

Antonious, 275 F.3d at 1075. Here, Soundview did more than the law requires. It inspected actual products before filing suit.

Soundview's September 1999 letters to the Sony parties (which they ignore) support Soundview's reasonable pre-filing investigation. For example, the Sony parties' exhibit 16 is a September 8, 1999 letter, with claim charts, from Gerald Hosier to Sony's Jaime Siegel. It states, with supporting exhibits and diagrams:

> We have now completed a preliminary investigation of the Sony model KV-24FV10, which is currently on the market and includes the V-chip function. It is believed that this model is representative of the current line of Sony V-chip equipped receivers, including models KV-25FV10 and KV-25FV10C. From our investigation, it appears that this design infringes the Soundview '584 patent.
>
> * * *
>
> A data slicer inside the M37273MF-245SP separates line 21 XDS data from a composite video signal applied to the chip and transfers the data to predetermined caption data registers by means of an 8 line data bus. The 8-bit CPU inside the M37273MF-245SP operates as a character decoder to decode predetermined digital codes of a special set of program rating indicating characters form the line 21 XDS data, via the data bus. This information is stored in predetermined RAM locations via the data bus.
>
> The 8-bit CPU compares the detected ratings conveyed to the CPU via the 8 line data bus to viewer selected ratings stored in the EEPROM (M24C08), also conveyed to the CPU via the 8 line data bus. In response to the comparison, the 8-bit CPU generates a logic output signal for selectively either blanking, or not blanking, the receiver output. As provided for in EIA standards EIA-608 and EIA-744A, the first three lines (D0-D2) of the 8 line (D0-D7) data bus are utilized to convey stored G, PG and R program rating signals, respectively, to the CPU for comparison with like

27

> user selected program rating signals, which are also conveyed over the same respective D0-D2 data bus signal lines. Thus, these bus signal lines in the model KV-24FV10 are the structural equivalent of and perform the same function as the program rating signal lines in the '584 patent.

(Sony's Ex. 16).

Soundview sent a similar letter to Toshiba on September 29, 1999, indicating (using diagrams and a claim chart) the results of its investigation of the Toshiba model CZ19M21 television set it had acquired and inspected. (Ex. V, identifying internal chips TMAA8700CKN-143, AT24C01A and TA1223AN). Soundview sent a similar letter to Sharp on September 29, 1999, indicating (using diagrams and a claim chart) the results of its investigation of the Sharp model 13L-M150B television set it had acquired and inspected. (Ex. W, identifying internal chips IX3256CE and M24C01B). After these September 1999 experiences with Sony, Sharp, Toshiba and several others, it became clear to Soundview that its infringement contentions applied equally to all microprocessor-based sets that complied with the v-chip standard, including Mitsubishi's. See Antonious, 275 F.3d at 1075 ("when a number of different products are charged with infringement it is not always necessary for the plaintiff's attorneys to inspect each product separately").

Hence, Soundview's prefiling investigation went well beyond what is required. Soundview acquired product samples, disassembled them, construed its patent claims and wrote claim charts comparing the patent claims to the analyzed accused products. (Ex. U, Cummings Decl. ¶¶ 3-7). The law requires nothing more. Since the Sony parties' motion fails even to acknowledge these efforts, they cannot be heard to complain that they were somehow inadequate.

## VII.  THE SONY PARTIES' LETTERS DO NOT PROVE BAD FAITH

The Sony parties contend their letters threatening to seek attorneys-fees illustrate Soundview's bad faith. (Sony Br. 10-11, 17). The fact that one party writes a letter to another saying,

in effect, "we're going to win" means nothing. For instance, the Sony parties lost on summary judgment their claim that they had a "government license". Sony v. Soundview, 157 F. Supp. 2d 172 (D. Conn. 2001). But the Toshiba and Sharp letters to Soundview (Sony Exs. 20, 21) each rely on this ultimately losing ground. The Sony parties turned out to be imperfect predictors of what would happen in this case. Soundview was correct to discount their self-serving letters and proceed with presenting the issue to the Court. See Q-Pharma, 360 F.3d 1295, 1303 ("The two (or four) letters from accused infringers questioning the validity of the '373 patent do not negate Q-Pharma's legal and factual bases for believing the patent to be valid."); Warner Lambert Co. v. Purepac Pharmaceutical Co., 2003 U.S. Dist. LEXIS 24369, at *11-*12 (D.N.J. 2003) ("While Purepac has presented evidence that Warner-Lambert was told that Purepac's gabapentin was anhydrous and produced in Israel, Warner-Lambert had the right to investigate those representations by engaging in discovery.").

Those letters are relevant in one respect. They show the Sony parties early-on had determined they would seek attorney-fees if they won, making it inexcusable for them to miss the deadline by two months. See Section II, above.

## VIII.  SOUNDVIEW'S CLAIM CONSTRUCTION BEFORE THE SPECIAL MASTER WAS REASONABLE

The Sony parties point out that Soundview modified its construction of "rating signal line" to align with the claim interpretation rulings of the Special Master, arguing that this somehow supports their claim that Soundview pursued this case in bad faith.

The Sony parties ignore that Soundview's initial construction of "rating signal line" in front of the Special Master was a natural extension of Soundview's initial, reasonable belief in how to construe the term "character" in the claims. (See Ex. F, Final Report at 39-41). As he held, "the

construction of 'rating signal lines' is inextricably linked to the proper construction of 'special set of characters' . . . ." (Ex. F, Final Report at 42). Once the Special Master resolved the difficult question of how to construe "character" (rejecting both Soundview's and the Sony parties' construction), Soundview adopted the Special Master's construction. This does not show bad faith, but good faith. "[S]ound judicial policy encourages a narrowing of issues." <u>Union Pacific Resources Co.</u> v. <u>Chesapeake Energy Corp.</u>, 236 F.3d 684, 694 (Fed. Cir. 2001) (affirming determination that dropping issues was not "exceptional or vexatious as compared to normal litigation.").

Referring to claim interpretation, the Court stated at oral argument that "[i]t is not easy" (Ex. E, Transcript at 95), and nothing illustrates this better than the thorough treatment given to claim construction by the Special Master in his 91-page Final Report. One of the difficult issues the Special Master resolved was what the word "character" means in the claims. (Ex. F, Final Report at 72-73). The Final Report devotes more space to construing the term "special set of characters" than to any other issue. (Ex. F, Final Report at 38-73).

In the initial claim construction briefing, Soundview pointed to evidence in the specification and the prosecution history that the "special set of characters" refers to the two parts of a rating code. (Ex. X, Soundview Br. at 15-18). Soundview's initial briefing also pointed out that, as a logical consequence of this interpretation of "special set of characters," the "separate rating signal lines" refers to separate paths within the character detector — one for the first part of the rating code, and one for the second. (Id.). While Soundview still believes this was a legitimate view of the claims, the Special Master rejected it (Ex. F, Final Report at 39-41; 44-45). The Special Master also rejected the Sony parties' view of how to interpret "character." (Ex. F, Final Report at 45-73; see also summary chart, Ex. II).

30

Disagreeing with both Soundview and the Sony parties, the Special Master held that the "special set of characters" refers to a representation of program content (for example, ratings G, PG and R are each different "characters"). (Ex. F, Final Report at 45-73, esp. 72-73; see also summary chart, Ex. II). Soundview adopted this ruling to narrow the issues. See Union Pacific Resources Co., 236 F.3d at 694 (narrowing issues is "sound judicial policy" and not a basis for finding case exceptional). Adopting the Special Master's view of "character" justified revisiting the related claim language, "separate rating signal line for each character of said special set." The result was the claim interpretation presented above (section IV), which was well supported by ordinary meaning definitions of "separate" and "line": namely, "a set of one or more conductors for each rating, where the set is distinct from (i.e., dissimilar to) those sets corresponding to other ratings." Later, the Sony parties' refusal (over Soundview's objection) to let the Special Master decide infringement issues (Ex. Y) precluded Soundview from presenting its harmonized claim interpretation to the Special Master. Nonetheless, nothing in the Special Master's earlier Final Report is inconsistent with Soundview's ultimate construction of "separate rating signal lines."

Both Soundview's initial construction (which flows from interpreting "special set of characters" as a two-part entity) and Soundview's later construction (which flows from the Special Master's interpretation of "character" as tantamount to a program rating) lead to infringement. The Sony parties characterize Soundview's actions as "flip-flopping" (Sony Br. 23). Instead, Soundview adapted to Court rulings, thereby narrowing issues. By contrast, the Sony Parties *objected* to the Special Master's construction of "character." Soundview's actions show good faith, not bad faith, and do not make this case exceptional. Union Pacific, 236 F.3d at 694.

## IX.    SOUNDVIEW'S RESPONSE TO THE SECOND ANTITRUST MOTION, AND NARROWING OF ISSUES FOR APPEAL, CANNOT MAKE THE CASE "EXCEPTIONAL" AS A MATTER OF LAW

Next, the Sony parties describe Soundview's pursuit of its antitrust issues as "exceptional" and "vexatious," even though the Court denied their motions to dismiss (157 F.Supp.2d 180), and denied (without prejudice) their first summary judgment motion in which the "no infringement-no damages" argument had merited only one sentence in a footnote (Ex. Z, 9/25/02 Order at 2; Ex. BB, 10/16/02 Tr. at 28-9). Nevertheless, the Sony parties argue that the non-infringement ruling made it "palpably frivolous" to pursue antitrust claims. (Sony Br. 25). This is not so, because Soundview's antitrust contentions were well founded in both law and economic theory, even after the non-infringement ruling.

At the October 16, 2002 status conference, Soundview summarized its theory that the illegal conduct had caused damages in spite of the subsequent non-infringement ruling (Ex. BB at 4-10). The Court recognized that the defense was newly raised (Ex. BB at 8, 25-6), and ruled that more briefing was needed (Ex. BB at 10-11, 19-20, 28-9). The need for briefing contradicts the assertion that Soundview's position was frivolous.

Sony did not support the "no infringement-no damages" theory with argument until the second summary judgment brief. Critically, the current motion fails even to cite, much less address, the theory argued by Soundview in Soundview's response brief (Ex.AA). The Sony parties do not even try to prove that the positions taken by Soundview in that brief are baseless, vexatious, exceptional, or anything of the sort. Their motion fails for that reason alone. The Sony parties' reliance on their own unsupported threats of Rule 11 sanctions (See Sony Br. 16-17; Sony Ex. 23

32

at 4, and Sony Ex. 24), all occurred before Soundview even filed its brief (Ex. AA), and do nothing to refute the propriety of Soundview's argument.

Soundview's responsive brief, now ignored by the movants, pointed out that there was economic demand for licenses, notwithstanding the Court's eventual non-infringement ruling. (Ex. AA, at 8-9). In support, Soundview pointed out several facts, including that three-quarters of the television industry took licenses, that Hitachi had concluded "EIA-608/EIA-744 INFRINGE CLAIM 1" (Ex. A), and that one of the R4.3 cartel members, identified the Soundview patent to CEMA as "*impossible* to get around it" (Ex. C). Soundview noted that antitrust injury existed because the Sony parties' actions contributed to a boycott of a good in commerce (i.e., patent licenses) which lowered the royalties paid before the ruling. (Ex. AA, at 9-10). Soundview cited relevant cases in support of its theory (Ex. AA at 6, 10). The Sony parties do not acknowledge these legal and economic principles supporting Soundview's continued pursuit of antitrust relief, much less prove by clear and convincing evidence that they were "frivolous." In sum, then, the Sony parties were put to no effort beyond filing a brief as requested by the Court on an issue they had not argued initially. Soundview did nothing more than respond with a legitimate argument. Moreover, Soundview also proposed staying further briefing on antitrust pending appeal (Ex. BB at 22-3, 30), but Sony resisted (Ex. BB at 23-4).

Inconsistently, the Sony parties also argue that Soundview's election to narrow the issues on appeal is itself "exceptional" and "vexatious" conduct. (Sony Br. 25). The Sony parties make the incomprehensible argument that, since Soundview only appealed for reinstatement of the antitrust case if its infringement case were reinstated, "the Non-Soundview parties were forced to spend money on this frivolous claim both here and at the Federal Circuit." (Sony Br. 26). The Sony

parties' argument does not make sense. Soundview was entitled to narrow the issues on appeal, and such conduct shows good faith, not bad. See Union Pacific, 236 F.3d at 694.

## X.    THE SONY PARTIES' REQUEST FOR FEES UNDER SECTION 1927 MUST BE DENIED

In sharp contrast to 35 U.S.C. § 285, which is exclusively compensatory, fee awards under 28 U.S.C. §1927 are penal in nature, and must be strictly construed:

> The Supreme Court has explained that this provision [28 U.S.C. §1927] "is *indifferent to the equities of a dispute* and to the values advanced by the substantive law. It is concerned only with limiting the abuse of court processes." *Roadway Express, Inc. v. Piper, 447 U.S. 752, 762, 65 L. Ed. 2d 488, 100 S. Ct. 2455 (1980).* The Eleventh Circuit has held that *§ 1927, "being penal in nature, must be strictly construed." Peterson v. BMI Refractories, 124 F.3d 1386, 1395 (11th Cir. 1997).*

Waymark Corp. v. Porta Systems Corp., 334 F.3d 1358, 1365 (Fed. Cir. 2003) (emphasis added) (following regional circuit law in connection with §1927 fee request). The statute covers only counsel who "*multiplies the proceedings* in any case unreasonably and vexatiously" and is limited to "*excess* costs, expenses and attorneys' fees *reasonably* incurred because of such conduct." 28 U.S.C. §1927 (emphasis added). "Multiplies" means that the "vexatious" conduct must "result in proceedings that would not have been conducted otherwise":

> Under the plain statutory language, objectionable conduct -- even "unreasonable and vexatious" conduct -- is not sanctionable unless it results in proceedings that would not have been conducted otherwise.

Peterson v. BMI Refractories, 124 F.3d 1386, 1396 (11th Cir. 1997). Consistent with these principles, this district has noted that the purpose of section 1927 is to deter unnecessary delays in litigation. United States v. Shuch, 139 B.R. 57, 63 (D. Conn. 1992) (citing H.R. Conf. Rep. No. 1234, 96th Cong., 2d Sess. 8, reprinted in 1980 U.S.C.C.A. 2716, 2782).

Under Second Circuit precedent,

the imposition of sanctions under § 1927 requires "a clear showing of bad faith on the part of an attorney," and that bad faith may be inferred "only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay."

Salovaara v. Eckert, 222 F.3d 19, 35 (2d Cir. 2002). Even reasserting specific legal theories after foreswearing them does not justify sanctions under section 1927. Id. Merely exhibiting poor legal judgment will also not support sanctions. Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 340 (2d Cir. 1999).

Neither Soundview nor its attorneys vexatiously multiplied these proceedings in any way: Soundview pushed for an early trial, while the Sony parties used every pretrial maneuver they could for delay. Soundview presented claim interpretation contentions which ultimately did not prevail. But, the Sony parties' arguments are all premised on the simple fact that the Sony parties prevailed on one and only one claim limitation; they lost on everything else of substance. Soundview believed in its case, just as three-quarters of the television industry believed in Soundview's chances of success. Sanctions are simply not warranted under such circumstances.

The Sony parties surprisingly point to the extra round of antitrust briefing between the non-infringement ruling and the appeal as the only evidence that Soundview did anything to "multiply" the proceedings. (Sony Br. 16, alleging Soundview "*forced* yet another summary judgment submission by the Non-Soundview Parties," emphasis added). The status hearing transcript (which the Sony parties failed to include among their exhibits) shows just the opposite. At that time, Soundview advocated for a *complete stay* to *avoid* the need for an extra round of briefing; it was counsel for *Sony* who insisted that the parties submit more papers to the Court. (Ex. BB at 22-4, 30). The Court sided with Sony, which is why the extra briefing went forward. Hence, if anyone is guilty of "vexatiously multiplying the proceedings," it is not Soundview.

35

XI.   **THE SONY PARTIES' OWN**
      **CONDUCT MERITS DENYING ATTORNEY-FEES**

In deciding the Sony parties' fee motion, "the court may consider the litigation actions of both sides in connection with § 285." Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1575 (Fed. Cir. 1996); Motorola, Inc. v. Interdigital Technology Corp., 121 F.3d 1461, 1468 (Fed. Cir. 1997) ("Moreover, even if the district court had found the case exceptional, it would have enjoyed considerable leeway to deny fees in light of Motorola's own litigation misconduct. ... The district court's denial of attorney fees under § 285 is affirmed."); Power Mosfet Technologies, LLC v. Siemens AG, 378 F.3d 1396, 1415 (Fed. Cir. 2004).

The Sony parties lost on numerous issues before they finally won on one. Early in the case they claimed they had an implied license from the government; the Court denied summary judgment in a manner that eliminated that defense. Sony v. Soundview, 157 F. Supp. 2d 172 (D. Conn. 2001). The Sony parties also sought dismissal of Soundview's antitrust case on the pleadings. The Court denied that request as well. Sony v. Soundview, 157 F. Supp. 2d 180 (D. Conn. 2001). EIA/CEMA tried to get Soundview's inducement of infringement case dismissed on the pleadings. The Court denied that motion, too. Sony v. Soundview, 157 F. Supp. 2d 190 (D. Conn. 2001). And during claim construction, the Special Master rejected the Sony parties' claim interpretation arguments for 6 of the 7 major interpretational issues. (Ex. F, Final Report; Ex. II, summary chart). The Special Master characterized interpretations by the **Sony parties** as "putting the claim language through the agony of torture." (Ex. F, Final Report 52). The Sony parties can hardly claim to be the sole proponents of winning arguments.

In addition to burdening the Court with numerous losing, and arguably meritless, motions and arguments on the claims and defenses, the Sony parties also tried to block discovery of key

36

information.  On August 16, 2001, the Court granted in part Soundview's motion to compel EIA/CEMA to produce withheld meeting documentation showing evidence of conspiracy. (Ex. CC). On the same day, the Court granted in part Soundview's motion to compel EIA/CEMA to produce documents improperly claimed as privileged. (Ex. DD).  On November 6, 2001, the Court granted Soundview's motion against all the Sony parties to compel production of improperly withheld opinion letters. (Ex. EE).  And on February 5, 2002, the Court granted in part Soundview's motion to compel Sony to produce further documents and Rule 30(b)(6) testimony. (Ex. FF).

In view of the Sony parties' own litigation actions in this case, at a minimum, the Court should exercise its discretion to find Soundview's actions not "exceptional" or warranting sanctions under either of sections 285 or 1927.

## XII.  **THE SONY PARTIES FAILED TO DOCUMENT THEIR FEES**

The Sony parties' fee petition also cannot support any award under Rule 54(d) or 35 U.S.C. § 285 for yet another reason.  Under Rule 54(d), the Sony parties were required to support their fee motion with a statement of the amount or a fair estimate of the amount of fees sought.  According to the Federal Circuit:

> Moreover, although our case law explains the application of 35 U.S.C. §285 as involving a two-step analysis of first determining whether the case is exceptional and then determining the amount of the award, the two component steps of the analysis are not independent.  Rather, *the amount of the attorney fees depends on the extent to which the case is exceptional.  In other words, the exceptionality determination highly influences the award setting.*

Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1344 (Fed. Cir. 2001) (emphasis added).  Awards of "all fees and costs" are improper. Beckman Instruments, Inc. v. LKB Produkter, AB, 892 F.2d 1547, 1553 (Fed. Cir. 1989); see also, Rambus Inc. v. Infineon Technologies AG, 318 F.3d 1081, 1106 (Fed. Cir. 2003).

Here, the Sony parties run afoul of Rule 54(d) by not presenting any calculation or estimate of fees whatsoever. The Sony parties run afoul of 35 U.S.C. § 285 by not linking their request for fees to a specific instance of alleged misconduct. This is yet another reason justifying denial of the fee motion in its entirety.

## XIII.  THE APPEAL COSTS ARE A RED HERRING

Citing a November 22 letter by Sony's counsel, the Sony parties complain that "Soundview has not timely paid the costs incurred by the Non-Soundview Parties during the appeal." (Sony Br. 24). What they fail to disclose is Soundview's December 3 response (not mentioned in Sony's December 8 brief), telling Sony that the request for payment was passed directly to Soundview (Ex. GG). Soundview placed the Kenyon invoice into its normal accounts payable queue, and paid the appeal costs in full less than three weeks after the December 3 response, on December 21. (Ex. HH).

## XIV.  CONCLUSION

The Sony parties have yet to own up to the fact that their fee motion was late. They offer no explanations supporting "excusable neglect." Their motion should be denied on that basis alone.

The outcome in this case was far from certain, and Soundview's pursuit of this litigation has always been reasonable. Nothing speaks better of the reasonableness of Soundview's actions than the fact that television set makers themselves admitted that the v-chip standard infringes the '584 patent, and that the patent is impossible to get around. Nor should Soundview be punished for advancing a claim interpretation that the Patent Office itself used during reexamination. This Court disagreed in the end, but that does not make Soundview's case frivolous.

As for the antitrust case, it was **Sony**, not Soundview, who insisted on adding a further round of briefing between the initial non-infringement ruling and the appeal. And during that briefing, Soundview advanced reasonable positions for why there could still be antitrust liability.

Because of the serious nature of the allegations, and the serious consequences of an adverse ruling, Soundview requests that the Court hold an evidentiary hearing if it is at all inclined to award attorney fees to the Sony parties. Due process and fairness require that the Court hear directly from the people whose reputation and financial interests might be negatively impacted by its decision.

Respectfully submitted,

SOUNDVIEW TECHNOLOGIES, INC.

John J. Bogdanski (ct06217)
David S. Monastersky (ct13319)
HOWD & LUDORF
65 Wethersfield Avenue
Hartford, Connecticut 06114
(860) 249-1361
Fax: (860) 522-9549

Raymond P. Niro (ct18107)
John C. Janka (ct20463)
Robert P. Greenspoon (ct21736)
Paul C. Gibbons (ct18826)
NIRO, SCAVONE, HALLER & NIRO
181 West Madison Street, Suite 4600
Chicago, Illinois 60602
Phone: (312) 236-0733

Attorneys for Soundview Technologies, Inc.

39

## CERTIFICATE OF SERVICE

The undersigned counsel of record hereby certifies that a copy of the foregoing **SOUNDVIEW'S OPPOSITION TO THE SONY PARTIES' MOTION FOR ATTORNEY FEES** was served upon lead counsel for the below listed parties by facsimile and first class mail (on all lead patent counsel) on January 12, 2005:

## SERVICE LIST

| Counsel for Consumer Electronics Association | |
|---|---|
| Counsel | Local Counsel |
| Peter J. Kadzik<br>R. Bruce Holcomb<br>Gary Hoffman<br>Kenneth W. Brothers<br>Jorge Kotelanski<br>Dickstein Shapiro Morin & Oshinsky<br>2101 L Street, N.W.<br>Washington, D.C. 20037<br>Tel: 202-785-9700<br>Fax: 202-887-0689<br><br>Tel: 202-775-4704 (Kadzik)<br>kadzik@dsmo.com<br><br>Tel: 202-828-2242 (Holcomb)<br>hoffman@dsmo.com | Connecticut<br>Jacqueline D. Bucar<br>Ben Solnit<br>Tim Jensen<br>Peter Sachner<br>Tyler Cooper & Alcorn<br>205 Church Street<br>New Haven, Connecticut 06509-1910<br>Tel: 203-784-8200<br>Fax: 203-865-7865<br>bucar@tylercooper.com<br><br>Tel: 203-784-8205 (Solnit)<br>solnit@tylercooper.com<br><br>Tel: 203-784-8228 (Jensen)<br>jensen@tylercooper.com<br><br>Tel: 203-784-8240 (Sachner)<br>sachner@tylercooper.com |

| Counsel for Mitsubishi Digital Electronics America | |
|---|---|
| Counsel | Local Counsel |
| Patent Infringement<br>Vincent J. Belusko<br>Eric Shih<br>Robert S. McArthur<br>Morrison & Foerster LLP<br>555 West Fifth Street<br>Los Angeles, California 90013-1024<br>Tel:    213-892-5200<br>Fax:    213-892-5454 | Connecticut<br>Joseph L. Clasen<br>James M. Ruel<br>David J. Burke<br>Robinson & Cole LLP<br>695 East Main Street<br>P.O. Box 10305<br>Stamford, CT 06901<br>Tel:    203-462-7510<br>Fax:    203-461-7599 |
| Counsel for Sharp Electronics Corporation | |
| Counsel | Local Counsel |
| Robert W. Adams<br>U.S. Mickey Gill<br>Nixon & Vanderhye, PC<br>1100 North Glebe Road, 8th Floor<br>Arlington, VA  22201-4714<br>Tel:   703-816-4000<br>Fax:   703-816-4100<br>email: rwa@nixonvan.com (Adams) | Connecticut<br>William M. Bloss<br>Alinor C. Sterling<br>Jacobs, Grudberg, Belt & Dow PC<br>350 Orange Street<br>New Haven, CT  06511<br>Tel:   203-772-3100 (x 271)<br>Fax:   203-772-1691<br>email: bbloss@jacobslaw.com |
| Counsel for Toshiba America Consumer Products, Inc. | |
| Counsel | Local Counsel |
| Larry S. Nixon<br>Michael Shea<br>Jeff Nelson<br>Nixon & Vanderhye, PC<br>1100 North Glebe Road<br>Arlington, VA  22201-4714<br>Tel:  703-816-4000<br>Fax:  703-816-4100<br>lsn@nixonvan.com | Connecticut<br>William M. Bloss<br>Alinor C. Sterling<br>Jacobs, Grudberg, Belt & Dow, P.C.<br>350 Orange Street., P.O. Box 606<br>New Haven, Connecticut 06503<br>Tel: 203-772-3100<br>Fax: 203-772-1691 |

| Counsel for Sony Electronics, Inc. and Sony Corporation of America | |
|---|---|
| IP<br>Richard I. Delucia<br>Richard Gresalfi<br>Elizabeth Gardner<br>Alex D. Skucas<br>Jeffrey S. Gerchuck<br>Thomas R. Makin<br>Kenyon & Kenyon LLP<br>One Broadway<br>New York, New York 10004<br>Tel: 212-425-7200<br>Fax: 212-425-5288<br>rdelucia@kenyon.com<br>egardner@kenyon.com<br><br>Antitrust<br>Richard M. Steuer<br>Mayer, Brown, Rowe & Maw LLP<br>1675 Broadway<br>New York, NY 10019-5820<br>Tel: 212-506-2500<br>Fax: 212-262-1910<br>rsteuer@mayerbrown.com | |